## THE M. J. CUMMINGS.

*(District Court, N. D. New York. 1883.)*

1. ADMIRALTY LAW—TOWAGE—LIABILITY OF TUG.
    A tug-boat cannot be considered a common carrier, nor an insurer, and the highest possible degree of skill and care are not required of her; but reasonable skill and care she is bound to exercise, and the want of either is a fault, rendering the tug liable to the full measure of the damages so resulting.

2. SAME—NEGLIGENCE.
    It was *held* negligence on the part of the captain or pilot of a tug to start on a trip with a tow, knowing that the tow was in a measure unseaworthy, that it steered poorly, that the lake was rough, the wind strong, and that night was fast approaching.

3. SAME—CONTRIBUTORY NEGLIGENCE.
    Where the captain and owners of a canal-boat and cargo permitted her to be taken as a tow, without any light or other means of signaling the tug, they having knowledge of all the facts above stated, *held* contributory negligence, and the admiralty rule of dividing the loss, in cases of mutual fault, applied.

4. SAME—TOWAGE CONTRACTS—LIABILITY FOR DAMAGES UNDER.
    The duty of a tow-boat in respect to the vessel in tow, not to cause injury to the same, does not arise out of the towage contract, but is imposed by law; and an agreement that the boat shall be towed at her own risk will not exempt the tow-boat from liability for damages caused by her own negligence.

In Admiralty.

*John Stowell*, proctor, and *Francis Kernan*, advocate, for libelants.
*H. C. Benedict*, proctor, and *S. A. Webb*, advocate, for claimants.

COXE, J. On Saturday, November 4, 1882, the canal-boat Carrie and Cora was lying at Fair Haven, loaded with fruit and vegetables. The cargo was the property of the libelants, and was worth the sum of $5,889.50. Fair Haven is at the head of Little Sodus bay, about a mile and a half from Lake Ontario, and distant from Oswego between 14 and 15 miles. The canal-boat was built in 1871 or 1872, and belonged to the class known as "Oneida lake scows." Her dimensions were as follows: Length, 98 feet; beam, 16 feet 8 inches; height, from 7 to 9 feet; and her extreme draught, when loaded as she was on the day in question, was 5 feet 1 inch. She had been employed in the carrying trade, as similar boats usually are, but had, perhaps, received more than ordinary hard usage. On one occasion, in the summer of 1880, she struck on a sharp rock and sunk in the Oswego river. She had been repaired from time to time, and when the accident occurred was in a fair condition for the canal, but was unsuited, except in calm weather, for any extensive navigation upon the lakes. Pursuant to an agreement with the Oswego Tug Company, she had been towed, unloaded, from Oswego to Fair Haven by the steam-tug M. J. Cummings on the day previous,—Friday, November 3d. The contract for towing was made in the latter part of October, between Mr. Loomis, one of the libelants, and Mr. Crimmins and Mr. Post, the former being the collector and agent, and the latter the secretary and treasurer, of the tug association. It was agreed

in substance, that the canal-boat should be towed to Fair Haven and back for $40, and that the price of towing a small schooner—the Collier—from Fair Haven should be left to the captain of the tug. During the conversation Mr. Crimmins stated that they could tow these boats—open-decked scows—in good weather; that the tugs took no chances on the lake at that season of the year. The tug was to come to Fair Haven upon the receipt of a telegram that the canal-boat was loaded. On Saturday morning, at about 9 o'clock, the loading having been nearly completed, the following telegram was sent by Mr. Loomis to Oswego:

"Carrie and Cora loaded. Come immediately."

Two hours afterwards the following answer was received from Mr. Post:

"Have been outside with tug. There is too much sea. Look out for the tug as soon as the sea runs down."

At about 4 o'clock in the afternoon the tug arrived. It was not possible, from the point where the Carrie and Cora lay, to see the open lake, or estimate the height of the waves, or the degree of safety with which a boat could be towed.

There is a marked conflict in the evidence as to what took place between the captain of the tug and those representing the canal-boat.

The libelants' version of this conversation is that when asked how the lake was "outside," the captain of the tug, Donovan, replied that it was a "little lumpy," but all right and perfectly safe to proceed.

The claimants, on the contrary, insist that Donovan simply stated that the weather was as good as could be expected at that time of year; that there was "a little roll outside," and that the boat need not go unless the libelants desired it, and, if they did not, he would return with his tug without her. Each version is corroborated by several witnesses. The conviction, however, left upon my mind, from all the facts and circumstances, is that Mr. Loomis, being unfamiliar with the navigation of the lake, and to a great extent ignorant of the nautical *data* upon which to base an intelligent opinion, referred the question to the captain of the tug, whether it was hazardous to proceed or not. Donovan had just come from the lake and knew its condition. Loomis knew nothing of this. It is undisputed that he was solicitous regarding the weather; all agree that the first question addressed to Donovan had reference to this subject—was it safe? His attention had been called in the morning to the disturbed state of the lake by the telegram just quoted, and he was anxious to be reassured before permitting his property to be taken. It is certain that, before the talk with Donovan, Loomis was considerably perplexed as to the prudence of the undertaking. Afterwards his fears were apparently allayed, and the tug started with her tow. Is not the inference a strong one that something was said upon this occasion to convey the

impression that the journey might be undertaken with safety? Would Loomis have allowed the boat to proceed if the complainants' version is the correct one? Is it probable that he would have hazarded $6,000 of property without some assurance that the journey could be made without danger?

The canal-boat was aground at Fair Haven and was pulled off by the tug. It is argued by the claimants that she was aground on a bottom full of boulders, logs, and other hard substances, and was, in consequence, strained, injured, and rendered less seaworthy. On the other hand, it is insisted that proof shows that she was upon a soft, muddy bottom, and came off easily and without effort. The evidence upon this branch of the case is somewhat speculative, and is, in my opinion, insufficient to sustain a finding that the boat was materially injured by reason of being aground. She may have been, but there is no positive proof of it.

After remaining several minutes, the tug started down the bay with the canal-boat and the small schooner before referred to, towing at the rate of three or three and a half miles per hour. She reached the parallel piers which extend into the lake, forming the harbor entrance, at a little before 5 o'clock. The velocity of the wind has been variously estimated, but, undoubtedly, the most accurate statement was given by the signal officer at Oswego. According to his records, at 7 A. M. the wind was east, four miles per hour; at 11 A. M., seven miles; at 3 P. M., north-east, eight miles; at 7 P. M., north-east, 11 miles. The day was clear. As to the height of the sea there is also great contrariety of testimony, some of the witnesses putting it as high as five feet and others as low as six inches. With this amazing disagreement among intelligent witnesses, it is, of course, exceedingly difficult to reach an accurate conclusion. Probably the truth lies somewhere between the two extremes; the most trustworthy evidence placing the sea, from the trough to the crest, at from one and a half to two and a half feet in height.

There was evidence that the captain of the boat, when passing the coal-dock, near the piers, signaled to be left there, but the signal was not seen, or, if seen, was misinterpreted by those on the tug. The first 'intimation the tug had that anything was wrong with the canal-boat was when off Ford's shoals, nine miles from Fair Haven, and four miles from Oswego. This was at 8 o'clock. They then heard cries of distress, and immediately turned about to render assistance. The captain and the two boys were rescued. The canal-boat was water-logged. Her stern and cargo went out soon after. She was a complete wreck. About 1 o'clock on the morning following the tug reached Oswego with the portion that remained, but it was so badly damaged as to be wholly valueless for purposes of navigation. A portion of the cargo was subsequently recovered, the total loss to the libelants being $5,047.88. The Collier broke away, and sailed back to Fair Haven, after they had been about an hour

and a half on the lake. It had then become very dark. The canal-boat had no light, or other means of signaling the tug.

The foregoing is a brief statement of the very voluminous evidence.

The libelants argue that the captain of the tug was chargeable with notice of the general character of the canal-boat. He had in the past frequently observed her at Oswego; he saw her loaded at Fair Haven; he towed her up, light, the day previous, when her condition, both inside and outside, to a certain extent at least, could easily have been discovered. They insist that, having just traversed it, he knew, or ought to have known, the dangers of the lake, and the effect which a head-wind and the sea then rolling would have upon such a craft and cargo; and that he is not exculpated by the suggestion that the boat might have stood the voyage had she been newer and stronger.

It is further argued that the libelants relied upon the statement of Capt. Donovan that it was safe to proceed, and would not have ventured out but for his assurance; that for all these reasons it was negligent to undertake the journey.

For the claimants it is insisted that the tug was under the management of a skillful and prudent master, and was properly manned and handled; that the canal-boat was old, decayed, and unseaworthy, though staunch to outside appearances; that she was loaded on a hard bottom, and pulling her off strained her seams; that she carried no light, and made no intelligent signal of distress until it was too late; that by the terms of the contract for towing, all risks were with the boat.

Before considering these conflicting propositions, it becomes important to ascertain what the law is as applicable to the case.

The authorities have been examined with care, and excerpts from some of the leading adjudications are here given.

Mr. Justice SWAYNE, in *The Margaret*, 94 U. S. 494, says:

"The tug was not a common carrier, the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed, reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences. * * * She was bound to know the channel, how to reach it, and whether, in the state of the wind and water, it was safe and proper to make the attempt to come in with her tow. If it were not, she should have advised waiting for a more favorable condition of things." Reported below, 5 Biss. 353.

The law is stated in these words in *The Quickstep*, 9 Wall. 670:

"It is well settled that canal-boats and barges in tow are considered as being under the control of the tug, and the latter is liable for this collision, unless she can show it was not occasioned by her fault."

In this case the damages were divided because of negligence on the part of the crew of the boat in deserting her sooner than good seamanship required.

In *The J. L. Hasbrouck*, 5 Ben. 244, and (on final decree) 6 Ben. 272, the propeller was held liable for casting the canal-boat off in a leaky condition, near a dock, and the canal-boat was held guilty of contributory negligence for not having an anchor, and for not using all her lines. Judge BLATCHFORD says:

"The faults of the canal-boat inure, as respects her cargo, to the benefit of the propeller, as against the owners of the cargo, in like manner as they inure, as respects the canal-boat herself to the benefit of the propeller, as against the owners of the canal-boat."

The loss was divided. In another case the same learned judge says:

"If the steam-boat was negligent in her navigation in towing the barge, whether she was towing under a contract of towage or not, she was as much guilty of tort towards the barge, if the barge was injured through such negligence, as she would have been towards a third and strange vessel which should have been injured through such negligence. The barge being lawfully where she was, the steam-boat owed a duty towards her independent of any contract of towage, and is liable for any damage to her, caused by negligent navigation amounting to a breach of such duty, to the same extent that the steam-boat would be liable, for such negligent navigation, to a vessel which she was not towing; or to the barge, if not towing her, and to the same extent that a third vessel would be liable, for negligent navigation, to the barge." *The Deer*, 4 Ben. 352.

In *The Wm. Murtaugh*, 3 FED. REP. 404, the court says:

"It is undoubtedly true that the master of a boat offering his boat to be towed, represents her as seaworthy, or fit for the voyage, and sufficiently strong, staunch, and sound to meet and withstand the ordinary perils to be encountered upon the voyage: and, in many cases of the loss of the boat towed upon the voyage, the tug has been absolved from responsibility because of the unseaworthiness of the tow, and her inability, by reason of weakness and decay, or of leaks, to bear the voyage; but there is an obvious distinction between defects or unfitness for the voyage, which can be seen and must be appreciated, upon the most casual inspection of the boat, and such as cannot be so seen. If the unfitness consists in what is perfectly obvious to the pilot of the tug when he takes the boat in tow, then clearly the tug undertakes to use a degree of care measured according to the obvious condition of the boat. If the unfitness is not thus obvious, he undertakes only for that degree of care which is proper and necessary for the management of a sound and seaworthy boat, as she is presumed to be; and to hold the tug liable for her loss arising from her unknown defects, in such a case, would be grossly unjust, and would encourage fraud and deceit. But the unfitness in the present case was obvious, and known to the pilot of the tug when he took the boat in tow. She was loaded, and had no hatch covers, and this was too obvious to escape his attention. Indeed, the proof is that he knew the fact. Therefore, he was bound not to tow her across the bay, in that condition, in the state of wind and tide existing. The pilot of the tug, or whoever on his behalf makes up the tow, and decides where and under what circumstances of wind and weather the voyage is to be made, assumed to determine these questions for the boats in the tow, with the ordinary care of a prudent owner in dealing with his own property, and in this respect those having control of this tug failed to exercise that degree of care and diligence. It was not, as suggested, *merely* an error in judgment in choosing between two possible courses. It was negligence which makes the tug liable for the ensuing damages."

The foregoing extract seems to me to be a clear and practical state-ment of the law as applicable to tugs in their relations with the vessels towed, and in many respects directly applicable to the case at bar. In this case, too, the libelant was found guilty of contributory negligence in allowing his boat to be taken out, and he was consequently awarded but half his damages. See, also, 17 FED. REP. 259, where the same facts were again before the court.

In *The Lady Pike*, 21 Wall. 1, the court held that "the owners of steamers undertaking to tow vessels are responsible for accidents, the result of want of proper knowledge, on the part of their captain, of the difficulties of navigation in the river in which the steamers ply." Same case, on second appeal, 96 U. S. 461.

In *The Syracuse*, 6 Blatchf. 2, the court held (Mr. Justice NELSON) as follows:

"One ground of defense set up is, that, by the contract of towage it was agreed that the canal-boat was to be towed by the steamer at her own risk. The answer to this is that this contract does not exempt the steam-boat from liability for damages caused to the canal-boat by the negligence of those in charge of the steam-boat."

*The Brooklyn*, 2 Ben. 547, was held liable for negligent towage, and it was said:

"That the duty of the steam-boat not to injure the canal-boat did not arise out of the towage contract, but was imposed by the law, and she was liable in the admiralty for negligent navigation, amounting to a breach of such duty."

In *The Workman*, 1 Low. 504, the charge was unskillful towage. The judge says:

"It seems clear that the bark was not sound, staunch, and seaworthy, as alleged by the libelant, and if this is a material and traversable averment it must be found against him. But there is no warrant of seaworthiness in a contract of towage, and the claimants cannot prevail on this point taken by itself, unless the evidence shall go the full length of showing that the whole damage was due to the state of the vessel. * * * My decision at present merely is that I cannot deprive the libelant entirely of damages, because I cannot be assured that the fault is wholly to be found in the defective character of his vessel."

In *The Merrimac*, 2 Sawy. 586, the tug was held liable for towing a scow out on the last of the ebb-tide, and, subsequently, against the flood-tide and wind.

In *Connolly* v. *Ross*, 11 FED. REP. 342, the tug was condemned for leaving canal-boats unattended and helpless, moored in a harbor unsafe in one quarter, and the boats were held negligent for overloading and improper loading. The damages were divided.

In *The Bordentown*, 16 FED. REP. 270, the tug was found at fault for placing an old boat in the head tier of the tow, and the boat was required to pay half the loss, because of her unseaworthy condition.

The court defines the word "seaworthy," in *The Orient*, 16 FED. REP. 916, to mean "such a condition of strength and soundness as to resist the ordinary action of the sea, wind, and waves during the con-

templated voyage. A ship is seaworthy in this sense when her hull, tackle, apparel, and furniture are in such a condition of soundness and strength as to withstand the ordinary action of the sea and weather."

In *The Jas. A. Wright*, 3 Ben. 248, and *The U. S. Grant*, 7 Ben. 337, the tugs were found guilty of negligence for towing through the ice.

See, also, as bearing upon the questions involved, *The Vigilant*, 10 FED. REP. 765; *The Henry Chapel*, Id. 777; *The Effie J. Simmons*, 6 FED. REP. 639; *The Norman*, 16 FED. REP. 879; *The Geo. L. Garlick*, Id. 703; *The D. Newcomb*, Id. 274; *The Webb*, 14 Wall. 406; *The Neaffie*, 1 Abb. (U. S.) 465; *The North Star*, 106 U. S. 17; [S. C. 1 Sup. Ct. Rep. 41.]

In the courts of our state substantially the same doctrines are enunciated, though in many cases with different results, due in several instances to the distinction existing between the rules of the admiralty and those of the common law.

In *Arctic Fire Ins. Co.* v. *Austin*, 69 N. Y. 471, it was held that the master of a canal-boat was under obligation to use every reasonable precaution, and to do whatever is necessary and customary to guard against the perils of navigation. The master of the tug is not responsible for the wrongful acts of those in charge of the boat, and their failure to display a light was held to be negligence, which barred a recovery.

In *Silliman* v. *Lewis*, 49 N. Y. 379, the tow did not have the light required by law. It was held that this fact alone would raise a presumption of contributory negligence, but that the want of a proper light was not a defense unless it contributed to the injury.

In *Milton* v. *Hudson River Steam-boat Co.* 37 N. Y. 210, the court, speaking of those engaged in the business of towing, says: "They are not insurers against even the waves and storms: they are not common carriers."

Within the rules thus established who was to blame for this accident?

*First.* As to the tug.

Keeping in view the authorities which this court is obliged to follow, it must be held that the tug was at fault. She did not arrive at Fair Haven till about 4 o'clock, though she well knew that the journey to Oswego with the two boats would occupy from four to five hours. She did not reach the lake with her tow till nearly 5 o'clock,— too late at that season of the year to make more than a third of the trip by daylight. Donovan knew the condition of the lake, and the direction and force of the wind. He knew generally, at least, the character of the boat; that she was an open scow, not new, loaded with fruit and vegetables. He knew that she steered poorly, for she showed this difficulty going down the bay. In these circumstances, and with this information, he started for a journey of 13 miles, on a rough lake, with head-wind, and night fast approaching, having

first given the assurance that the trip could be made without serious danger. These were faults for which the tug should be held responsible, within the cases quoted. Prudence and good seamanship required that he should not have attempted the journey at such a time and with such a boat.

The language used by Crimmins, that "the tugs took no chances on the lakes at this time of the year," can hardly be regarded as entering into and forming a part of the towage contract. But if it did, the answer may be stated in the language of Mr. Justice NELSON in *The Syracuse, supra:* "This contract does not exempt the steam-boat from liability for damages caused to the canal-boat by the negligence of those in charge of the steam-boat."

Again, the stipulation, if it was one, was waived and superseded by the subsequent conversation at Fair Haven. The captain had the same right to bind the tug that the officers of the association had. If Crimmins had supplemented his statement by saying, "There is a little roll outside. I think, however, that it is safe for the boat to go to-day,"—there would have been little left of which to predicate a finding that the sole risk should be with the owners of the canal-boat and cargo. The tug must, therefore, be held liable.

*Second.* Was the canal-boat free from blame? Her captain, and the libelant Mr. Loomis were both aware in the morning that there was too much sea to attempt a journey. They knew after the tug arrived that it was "a little lumpy," or that there was "a little roll outside." They knew also, much better than Donovan, the strength and seaworthiness of their boat; that she was heavily loaded and steered badly; that there was a head-wind; and that night was near at hand. And yet they permitted their property to be taken. The law required the canal-boat to carry a light, and common sense and prudence should have dictated it, in the absence of an express requirement. It is argued that the want of a light did not contribute to the accident; and yet how can this proposition be maintained? Knowing that darkness would surely overtake him, and that as against a head-wind the human voice would be ineffectual, the captain of the boat started with no means of communicating with the tug. This was negligence.

Before reaching the piers, while yet in the safe waters of the bay, all on board the boat noticed the dangerous condition of the lake. If the sea was as high as Capt. Bach testified it was, or if he thought it was high, he must have known that his boat could not live long in such disturbed water. It was plainly his duty to put forth every effort to prevent the tug from proceeding. When he found that the other means employed proved abortive, he might, if necessary, have thrown off the line; such a course would surely have brought the tug to his side. Even had the tug proceeded alone it would have been much safer for his boat to anchor or drift in the bay, than to breast the sea which, as he swears, confronted him. It is true that the captain and the two boys testify that they motioned and called to be

left at the coal-dock, but they were motions that could easily be misinterpreted, and it was very evident that no one on the tug understood them.

One or two other witnesses not on the boat saw some motions while the tug was in the bay, or going through the piers, but they did not know their meaning.   As bearing upon the extent of the effort made to stop the tug, it should be remembered that when the danger was imminent at Ford's shoals, little difficulty was experienced in making the tugmen hear, although in circumstances far more disadvantageous. In view of all the evidence it can hardly be said that any vigorous, determined effort was made to have the tug turn back after the threatened danger was discovered.   The impression left is that Bach thought he could go through safely, and, having made a feeble remonstrance, concluded to take the risk.   After they had been on the lake for an hour, or an hour and a half, it became very dark.   Nothing indicating inevitable disaster had happened while it was yet light.   If there had been a light on the boat they could have signaled the tug when the Collier broke away, when the horse-bridge went off; indeed, when the first indication that there was danger of the boat becoming water-logged appeared.   How can it be said that in all this there was no fault? If the tug had known the truth regarding the tow before all hope was abandoned, might she not have averted the accident, or at least have saved a large part of the cargo?   Upon the facts developed, the law imputed to the libelants the negligence of those having charge of the canal-boat; so much was virtually conceded on the argument, and the case was tried upon that theory.   But in any event, having reference solely to the libelants' own conduct, enough has been established to warrant the application of the admiralty rule before adverted to, and which obtains in cases of mutual fault.

There should be a decree for the libelant for $2.523.94.