404

THE PERTH AMBOY NO. 4.

No. 218.

Circuit Court of Appeals, Second Circuit.
May 3, 1943.

Burlingham, Veeder, Clark & Hupper and Chauncey I. Clark, all of New York City, for Fred B. Dalzell, claimant-appellant.

Macklin, Brown, Lenahan & Speer and Leo F. Hanan, all of New York City, for libellant-appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

PER CURIAM.

The deck scow Marie, owned by the libellant, capsized and dumped her cargo on November 11, 1937, while in tow of claimant's tug Perth Amboy in the Passaic River. The court held the Perth Amboy responsible for the casualty to the libellant's scow and cargo but directed that the recovery should be subject to limitation of liability.

The scow had been loaded with approximately 623 tons of scrap steel under the supervision of the employees of the Tidewater Steel & Iron Company at the plant of the latter on the Passaic River. About 12:20 in the morning of November 11, 1937, the Perth Amboy took the Marie in tow and proceeded with her down the river in the direction of Newark Bay, with the Pennsylvania stakeboat as the proposed destination. The tug towed the scow by two 35 foot hawsers. As soon as the Marie was taken from her pier she developed a list to port, though the bargee had told the tugmaster when she started that she was not leaking. During the course of the tow down the river there was a strain on the starboard hawser, while the port hawser was slack. As a result, the list to port increased, so that the port deck of the Marie was under water, while the starboard deck was some 2½ feet above water, and she developed a leak, or increased a leak that had already existed, because of the strain to which she was subjected. Likewise because of the increase in the list to port some of the cargo shifted. The bargee did not pump out his scow while she was in tow, though the pumps were in working order. When she passed through the Delaware, Lackawanna & Western Railroad Bridge the list had become so great that she was in danger of capsizing and the bargee sung out to the deckhand on the tug: "She's got some water in her; she must be making water." Her dangerous condition also seems to have been noticed by the man at the draw as the tow passed it. Farther down the river, near the Avondale Bridge, the bargee climbed over the load of scrap steel and came out to the bow of the barge to inform the tugmaster that she was leaking and had over a foot of water in her hold. After she had gone on about a mile and a half further and was approaching the next bridge, the bargee again started to climb over the load to give warning to the tug, or make an appeal for help, but, before he reached the bow and could say anything to the tugmaster, the scow overturned and dumped her cargo.

The libellant, as owner of the scow and bailee of her cargo, filed a libel against the Perth Amboy to recover the damages sustained by the barge and her cargo through the negligence of those in charge of the tug. The trial judge granted an interlocutory decree in favor of the libellant based upon the facts which have been

outlined. Although he found the bargee negligent in not operating the hand pump while the scow was being towed, he concluded that the negligence of the tug was the proximate cause of the accident in that (1) it continued to tow the scow after she had been informed that it was leaking and had over a foot of water in the hold, (2) it took no steps to beach the scow or siphon her out when knowing that she was leaking and that she had a dangerous list.

The claimant argues that the scow was unseaworthy and unstable because of the water in her hold and her heavy list and that the bargee was incompetent and negligent. He accordingly desires us to hold that the casualty was due solely to the unseaworthiness of the barge and the negligence of her master, or at least that these factors so contributed to the loss that the damages should be divided.

There was, however, substantial evidence to support the finding of the trial court that the scow was not overloaded, that she had been repaired not long before the accident, and that only a month before she had carried a load of scrap iron from Passaic to the Pennsylvania stakeboat in tow of the Perth Amboy without any unusual incident. There was likewise evidence that the amount of water found to have got into the hold of the vessel rendered her very unstable and that with the heavy list arising from the shifting of her cargo, she was in condition of dangerous instability, of which the tugmaster ought to have been aware. Whether or not to proceed with a barge in such an unseaworthy condition was not a matter to be determined by an inconspicuous bargee and his recommendation to go ahead, if he ever made it, was no excuse for the subsequent action of the tugmaster. Even if the bargee should have used his pump in order so far as possible to reduce the amount of water in the hold, we think it most unlikely that the use of a hand pump after the cargo had shifted would have resulted in averting the disaster. On the other hand, after that time, the tugmaster could apparently have prevented the scow from capsizing if he had used his siphon to remove the water or had beached her, or had done both. It is true that there was a dispute as to whether it was practicable for the tug to siphon the barge, or to beach her, or to do both. But the trial court found that it was practicable to do both

and its findings are supported by substantial credible evidence. In short, though it be admitted that the bargee was negligent in failing to pump out his barge during the voyage, the final cause of the disaster was the neglect of the tugmaster to do anything to prevent it at a time when his prompt action was the only means of saving the situation and would have saved it.

We regard this case as purely one of fact. We hold the findings of the trial judge not only not clearly erroneous but fully warranted by the evidence. Inasmuch as the facts were dealt with by Judge Leibell, who conducted the trial, in a full opinion and in ample findings, there can be no advantage in a more elaborate discussion of the various inferences which might have been drawn from the testimony of the different witnesses. If some of the possible inferences might have differed from those drawn by the court the findings actually made were within the province of the trier of the facts.

Decree affirmed.