**HOUMA WELL SERVICE, INC.,
Plaintiff,**

v.

**TUG CAPT. O'BRIEN, her engines, tackle, apparel, etc. and O'Brien Tugs, Inc., Interstate Fire and Casualty Company, Otto Candies, Inc. and Venice Work Vessels, Inc., Defendants.**

**Civ. A. No. 66-883.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

April 17, 1970.

---

George W. Healy, III, Theodore G. Dimitry, New Orleans, La., for plaintiff.

William A. Porteous, III, New Orleans, La., for defendants Tug Capt.

O'Brien, O'Brien Tugs, Inc. and Interstate Fire and Casualty Co.

Rufus C. Harris, Jr., New Orleans, La., for defendant Otto Candies, Inc.

H. Barton Williams, New Orleans, La., for defendant Venice Work Vessels, Inc.

RUBIN, District Judge:

A workover drilling barge under tow up the Mississippi River capsized. The barge's hull insurer paid the owner and the cargo interests and sued the tug, its owners, and their insurers, to recover its loss alleging that the tug was negligent and had violated its contract of towage. It also sued another tug that had assisted in the towage for a part of the voyage.

Workover Barge No. 9 was under contract to work over a well for Superior Oil Company at Cox Bay, which is in the Louisiana marshes east of the Mississippi River near Port Sulphur in Plaquemines Parish. When the job was completed, Superior contracted with Otto Candies, Inc. (Candies) and Venice Work Vessels, Inc. (Venice) each to furnish a tug to return the barge to its owner in Houma, Houma Well Service, Inc., and also to tow the barge used as quarters for the workover crew. Venice arranged for O'Brien Tugs, Inc. (O'Brien) to furnish the tug M/V CAPT. O'BRIEN, and Candies furnished the tug M/V MADELINE.

When the tugs left Cox Bay, Barge No. 9 was being towed by the CAPT. O'BRIEN; the quarterboat was in tow by the MADELINE. Later the two tugs pulled the two barges through the marsh waters together. When the tugs reached deeper water again, the CAPT. O'BRIEN took Barge No. 9 in tow while the MADELINE undertook to tow the quarterboat.

The plaintiff's evidence showed that the barge was designed, built, and equipped in a manner common to inshore workover barges intended for comparable use. It had been moved on many prior occasions without difficulty.

The plaintiff contends that the tugs MADELINE and CAPT. O'BRIEN negligently towed the barge through mud flats and oyster reefs. This required the barge to be hauled and pushed and caused severe strains on the hull of the barge. It must have caused leaks in the barge, and also must have breached its center bulkhead. The result was that the barge became unstable. This condition was reflected by the fact that the barge flopped back and forth in deeper water. Nevertheless, those in charge of the two tugs made no effort to inspect the barge and determine whether or not it was taking on additional water or required pumping out.

The defendants assert that Workover Barge No. 9 was unseaworthy, and that this was the sole cause of the capsizing. They offered evidence that the barge had been "cranky" or difficult to handle. They contended that there had been no evidence of a condition serious enough to warrant inspecting it, let alone pumping or beaching it.

After leaving the Ostrica locks, the CAPT. O'BRIEN towed the barge up the Mississippi River about 4½ hours. The tow met two or three passing vessels without incident. Then a vessel passed it leaving a wake about two feet high. The wake caused the barge to list to one side and it then listed far to the other side and capsized.

### TOWER'S DUTY

When a contract is made to tow a vessel, the owner of the tow warrants the seaworthiness of his vessel, and the owner of the tug is responsible for its safe navigation.[1] The failure of the towing tug to comply with the standards of safe navigation is a breach of the contract, but the burden of proving the default rests on the owner

---

1. Curtis Bay Towing Co. of Va. v. Southern Lighterage Corp., 4 Cir. 1952, 200 F.2d 33; Valentine Waterways Corp. v. Tug Choptank, E.D.Va.1966, 260 F.Supp. 210, aff'd, 4 Cir. 1967, 380 F.2d 381. See also the cases collected at note 5 in Star Towing Company v. Barge ORG–6504, E.D.La.1969, 301 F.Supp. 819, 822.

of the tow who seeks to recover for it.[2] The duty of the towing vessel is "to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Stevens v. The White City, 1932, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699.

## BURDEN OF PROOF

The mere fact that the tow is damaged or lost does not raise a presumption of fault on the part of the tug. Stevens v. The White City, *supra*.[3] Nor is the doctrine of res ipsa loquitur applicable.

"[A] tow is presumed to be unseaworthy when she sinks under normal conditions, and in the absence of proof that she was improperly handled," the court said in South, Inc. v. Moran Towing & Transportation Co., S.D.N.Y. 1965, 252 F.Supp. 500, 505.[4] But this does not alter the rule that the owner of the tow cannot recover for damages that occur during the towage unless he proves fault.[5] Here as generally elsewhere in admiralty, the burden of proof is on the claimant "to show that the loss for which he [seeks] recovery was caused by a breach of [the towing vessel's duty]." Stevens v. The White City, 1932, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699. When a vessel does not merely sink but capsizes after being under tow for an extended period of time, the expert testimony indicates, the instability should be apparent for some time before it results in overturning the vessel.

Plaintiff contends that it is an anachronism to impose the burden of proof on the owner of the tow, and likens the case to the situation of the bareboat charterer who is required, if he returns the vessel in damaged condition, to exonerate himself from fault.[6] But the charterer assumes responsibility for the vessel; he takes it entirely under his control. The tower, on the other hand, is not a bailee. He neither takes possession of the vessel nor responsibility for its cargo or crew; he undertakes merely to tow it.

The key question here, then, is whether fault has been shown on the part of the tower. The cases dealing with liability for damages sustained when a tow is run aground are clearly inapposite.[7] For in these cases the damages were shown to have resulted directly from the grounding. It cannot be doubted that the tower is responsible if he damages the tow by negligently running it aground or if, having noticed that the tow is in danger, he fails to take proper steps to prevent further damage to it.[8]

2. Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Stall & McDermott v. The Southern Cross, 5 Cir. 1952, 196 F.2d 309, affirming E.D.La.1951, 95 F.Supp. 612.

3. Other cases so holding include The L. P. Dayton, 1887, 120 U.S. 337, 7 S.Ct. 568, 30 L.Ed. 669; Stall & McDermott v. The Southern Cross, note 2 *supra*; River Terminals Corp. v. Southwestern Sugar & M. Co., 5 Cir. 1960, 274 F.2d 36; Curtis Bay Towing Co. v. Southern Lighterage Corp., note 1 *supra*. In another capsized vessel towage case, the court said, "The burden is plainly on the libelant to prove fault." Atlantic Gulf & Pacific Co. v. The Barney Turecamo, S.D.N.Y. 1962, 202 F.Supp. 31, 34, 1964 A.M.C. 2195, 2199.

4. See River Terminals Corp. v. Southwestern Sugar & M. Co., note 3 *supra*; Stall & McDermott v. The Southern

Cross, note 2 *supra*. See also the cases collected at note 7 in Star Towing Company v. Barge ORG–6504, E.D.La.1969, 301 F.Supp. 819, 823.

5. See the cases cited in notes 2 and 3 *supra*.

6. Edward G. Murray L. & T. Co. v. Pennsylvania R. R., 2 Cir. 1942, 130 F.2d 199; The E. T. Halloran, 2 Cir. 1940, 111 F.2d 571, 572; Tomkins Cove Stone Co. v. Bleakley Transp. Co., 3 Cir. 1930, 40 F.2d 249, 251; Banks v. Chas. Kurz Co., E.D. Pa.1947, 69 F.Supp. 1017, 1018.

7. See, *e. g.*, The Inca, 5 Cir. 1906, 148 F. 363 and cases cited therein.

8. See, *e. g.*, Curtis Bay Towing Co. v. Southern Lighterage Corp., note 1 *supra* and Mississippi Valley Barge Line v. T. L. James & Co., E.D.La.1955, 144 F.Supp. 662, aff'd, 5 Cir. 1957, 244 F.2d 263.

The plaintiff's claims here rest fundamentally on two propositions: (1) the tower caused the rig to become unseaworthy by running it aground; (2) the tower knew or should have known the rig was in distress (whether or not the hazard had been created by the grounding) and should have taken steps to save the rig either by pumping or beaching it.

The defendant contends that it was essential to navigate shallow marsh waters, groundings were to be expected, and there is no proof that damage of any kind resulted from them. The defendant therefore attempts to account for the overturning of the barge by questioning her stability, hence her seaworthiness. On the record this is the pivotal issue because there is no evidence to justify the conclusion that the grounding of the barge damaged it in any way.

## THE EVIDENCE

The parties relied on the testimony of expert witnesses with respect to whether or not the barge was unstable when the voyage began. But the experts relied on hypotheses concerning the weight and placement of the pipe and gear on the barge. These suppositions do not adequately account for the total weight actually aboard the barge. For, based on the oral testimony as to its draft and freeboard, and the computation of its displacement on the application of Archimedes' principle, the vessel was carrying much more weight than could be accounted for by its construction and cargo, including fuel, pipe and gear. From the testimony, I conclude that there was mud or silt, together with a substantial amount of water ballast in its tanks, when the barge left Cox Bay. The barge does not seem to have been inherently unstable; it had made similar voyages without mishap many times before. But there was evidence that, on this trip the barge was difficult to handle from the time she was taken in tow at Cox Bay. Both of the captains of the towing tugs characterized her behavior as "cranky." Indeed, the captain of the MADELINE said he had followed the CAPT. O'BRIEN, and noticed that the barge listed to one side and then another. "She'd ride 15 to 45 minutes perfect; then she'd list again." He discussed this with the captain of the CAPT. O'BRIEN and told him, "I have towed the rig before and she was cranky." These manifestations began "right after we got off location."

There is evidence that silt or mud might have accumulated in the bilges, and the barge's crew added water ballast to correct a list just before this trip. The fact that the barge was cranky indicates, according to the expert witnesses, that its stability was endangered. The addition of water ballast in a vessel of this type is undesirable. It creates a free surface condition hazardous to stability. It lowers the freeboard and creates the possibility that one edge of the deck may go under water. When this happens, the barge's instability is dramatically increased. That she had been in fact cranky on prior voyages merely indicates that she may have been improperly loaded or ballasted on those occasions as well.

There can be no doubt that the only course available was through shallow waters. The fact that the barge went aground is no evidence of improper navigation. And only speculation can support the hypothesis that the barge was damaged at all by its grounding or, if damage ensued, that this was of a nature to cause her to capsize. A leak in the hull might have caused the barge to sink, but the testimony of the plaintiff's expert was that mere damage to the hull would not have caused instability such as to make the barge capsize unless it progressed to the point that the freeboard was so far lowered that water was over the deck's edge or unless the center bulkhead was breached. There is no evidence that either of these conditions developed.

Therefore, it must be considered established that the disaster did not result from damages sustained during the voyage. But it must likewise be con-

sidered that the vessel was less stable than it should have been. Given then a barge that was unstable, handling difficulties were created for the tower. These diffficulties should have been a warning to those in charge.

The testimony offered by the defendant's captain and others who observed the tow is that the barge looked all right; they did not consider the "crankiness" an indication of instability. Yet the barge capsized in calm water, after passing the moderate-sized wake of a passing vessel. Of all of the unlikelihoods in the case, the greatest is that the vessel suddenly capsized without evidencing any instability and, without having taken on water sufficient to lower her freeboard significantly. This supposition is untenable.

## THE TOWER WAS AT FAULT

■■ The evidence indicates that the CAPT. O'BRIEN knew or should have known that the barge was or had become unstable. It was then the tower's duty to put into a safe spot or ground the barge in shallow water until the cause of her difficulty could be determined and corrected. There was at least one place the barge could safely have been tied up, and many places she could have been put aground. In addition there was a radio on the CAPT. O'BRIEN that could have been used to call the owner or the tug's home office at Venice for instructions. But the captain failed even to seek directions or assistance. It is not sufficient justification to urge that, were voyages of this sort interrupted, the tug would lose business. When it has, or should in the exercise of proper care, become evident that the tow is in hazard, it is the tower's duty to take reasonable measures to avert further damage to it. This the tower here failed to do.

The defendant contends that the tug did in fact keep the tow in close and careful observation for the entire voyage, and therefore that it did not breach any duty that it owed the tow. The facts are correct; the conclusion is wrong. The tug's crew observed the tow; they saw manifestations of its instability.

The defendant argues observation of the tug's behavior does not mean awareness of danger; it contends that it is a common practice to tow workover barges that are "cranky" or "tender."

■ But the testimony of the two captains shows that they not only were aware of the manifestations of unseaworthiness but also were concerned about the barge's safety. Indeed, even if they did not in fact appreciate the danger, actual awareness of hazard is not the exclusive test. The captains were held to the standard of prudent navigation, including the knowledge they should have had.

■■■ Nor are custom and usage the sole criteria of reasonable care. Even time-honored conduct may not be reasonable. One who elects to ply his trade by running time-honored risks may do so at the peril of liability if the risk materializes. The evidence here indicates that the towing master did not follow standards of prudent navigation. The evidence by all the experts, including those called by the defendants, is that the tug's captain should have taken prompt action either to stop the tow in shallow waters, when the condition was first observed, and to radio for instructions, or, if the condition was observed in the river, to "run to the bank." Failing to do this, the tug breached the duty it owed and this breach was the proximate cause of the accident.

Defendant contends that at least the mutual fault rule applies here. The Brussels Convention of 1910 with respect to collision matters provided for the assessment of damages by proportioning fault. Bue, Admiralty Law in the Fifth Circuit, (Part II) 1968, 5 Houston L. Rev. 772, 776. Since the United States did not ratify the convention, American courts have continued to apply the rule of divided damages in mutual fault collision cases, as they had already long done. Schooner Catharine v. Dickinson, 1854, 58 U.S. (17 How.) 170, 15 L.Ed. 233. See the discussion in Bue, *id.* at 777 et seq. Extending a similar rule to

a situation where a harbor tug lashed to the side of a pushboat capsized as a result of what was found to be mutual fault, the Fifth Circuit Court of Appeals recently said,

"We disagree with Chitty that this case was proper for application of the principle of condemning the more culpable vessel, *e. g.*, Compania de Maderas de Caibarien, S.A. v. The Queenston Heights, 5 Cir. 1955, [1955 A.M.C. 797] 220 F.2d 120, for it appears clear to us that this is a mutual fault collision case." Chitty v. M/V Valley Voyager, 5 Cir. 1969, 408 F.2d 1354, 1358, 1969 A.M.C. 689, 694, affirming 284 F.Supp. 297, 1968 A.M.C. 2776.

The mutual fault rule was also applied when the tug and its tow collided in Puget Sound Tug & Barge Co. v. S. S. Lindenwood Victory, W.D.Wash.1969, 305 F.Supp. 570, 1969 A.M.C. 1962.

But the doctrine of mutual fault has not been applied in those towage cases where the tug clearly has the final opportunity, as well as the duty, to avert the damage, sometimes called the last clear chance. In Henry Du Bois Sons Co. v. Pennsylvania R. Co., 2 Cir. 1931, 47 F.2d 172, the court held a tug liable for the sinking of its tow when the tug could have prevented the casualty by prompt action. It said:

"It is true that there is no evidence that the Margaret G was seaworthy when taken in tow or to show what caused the leaking or just when it began. If it be assumed for the argument, however, that she was unseaworthy when the voyage began, the tug is, nevertheless, liable for any loss attributable solely to its failure to exercise due care to save the boat and cargo from that damage which it could have prevented by taking reasonable and prudent action to protect the boat and cargo from sinking from whatever cause. McCormick v. Jarrett (D.C.) 37 F. 380. See The M.J. Cummings (D.C.) 18 F. 178; The Jonty Jenks (D.C.) 54 F. 1021. Nor

was it shown that the captain of the Margaret G could have obtained assistance after being moored and abandoned or failed to do all within his power to prevent sinking. On the evidence, the [tug] Mercer is responsible for all the damage caused solely by the sinking of the coal boat." 47 F.2d at 174.

This rule has since been consistently applied in the Second Circuit. Then Senior Circuit Judge Learned Hand wrote, in Chemical Transporter, Inc. v. M. Turecamo, Inc., 2 Cir. 1961, 290 F.2d 496, his last opinion:

"It is indeed true that the barge was at fault as well as the tug, but the tug's fault occurred after the consequence of the barge's fault had become apparent. That is to say though we were to concede that the tug did not know of the existence of the hole at any time before the barge capsized, it had become altogether aware that for some reason the barge was in serious trouble and needed immediate attention. So far as concerned the tug's duty, it was of no importance what the cause of this was; she was bound to adapt her navigation to the emergency so presented to her, even though it was not of her own doing.

The tug was therefore guilty of negligence and was liable; and the question arises whether the case does not fall within the ordinary doctrine that damages are divided when both parties are at fault. Neither party has raised the point in the case at bar, but we will pass on it now because the answer is clear, at any rate in this court. In at least four decisions we have passed upon carelessness of a tug that caused damage to another vessel, which was herself also guilty of an earlier fault, contributing to the result; and we have held that, if the fault of the earlier vessel was obvious to the tug in time for the tug to accommodate her own navigation to the emergency, the tug alone was liable. Henry Du Bois Sons Co. v. Pennsylvania R. Co., 2 Cir., 47 F.2d 172; The Perseverance,

2 Cir., 63 F.2d 788; The Sanday, 2 Cir., 122 F.2d 325. Sternberg Dredging Co. v. Moran Towing & Transp. Co., 2 Cir., 196 F.2d 1002. In The Cornelius Vanderbilt, 2 Cir., 120 F.2d 766, we assimilated this situation to that of the "last clear chance," and, indeed, that is what it is. When the fault of the first vessel appears or should be evident to the second early enough for the second to escape injury to the first vessel and herself, she must do so, if no more is required than a change in the navigation of the second vessel which involves no further burden than inconvenience. We can see no reason why because the first vessel has imposed so trifling a burden upon the second, she should be punished by the loss of relief for the injuries which the second has caused her. We do not mean to question the validity of dividing the damages when the faults are simultaneous, or substantially so, but cases such as that at bar demand a different treatment." 290 F.2d at 497–498.

See also The Perth Amboy No. 4, 2 Cir. 1943, 135 F.2d 404, 1943 A.M.C. 679; Tebbs v. Baker-Whiteley Towing Company, 4 Cir. 1969, 407 F.2d 1055, 1058; Southwestern Sugar & M. Co. v. River Terminals Corp., E.D.La.1957, 153 F.Supp. 923, 927; Intracoastal Liquid Mud, Inc. v. Choate, La.App.1969, 3 Cir., 225 So.2d 642. *Cf.* Curtis Bay Towing Co. v. Southern Lighterage Corp., 4 Cir. 1952, 200 F.2d 33.

The insurers also claim separately the value of cargo lost in the casualty as subrogees of the cargo interests. Even had the tow been negligent, its negligence is not imputed to its cargo. Robinson on Admiralty, 674 (1939). If tug and tow had been jointly responsible for the capsizing and consequent loss of the cargo, the cargo would owe no share of the liability; it would be entitled to recover from both the tug and the tow. Under the facts here, the cargo interests are entitled to recover from the tug for their loss in full.

For the reasons assigned, judgment will be entered in favor of the plaintiffs and against the defendants on the issue of liability. If the parties cannot agree on the amount of damages within 60 days, the plaintiff is to notify the court so that it can refer the matter of damages to a special master.