**McDONOUGH MARINE SERVICE, INC., a division of Marmac Corporation, Plaintiff,**

**v.**

**The M/V ROYAL STREET, her engines, tackle, etc., in rem, and Schieffler Brothers Marine, Inc., in personam, Defendants.**

**MORTON CHEMICAL COMPANY, a division of Morton-Norwich Products, Inc., Plaintiff,**

**v.**

**The M/V ROYAL STREET, her engines, tackle, etc., in rem, and Schieffler Brothers Marine, Inc., in personam, Defendants.**

Civ. A. Nos. 76–3127, 77–435.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Jan. 19, 1979.

John J. Broders, New Orleans, La., for plaintiff, McDonough Marine Service, Inc.

John Poitevent, New Orleans, La., for plaintiff, Morton Chemical Co.

James G. Burke, Jr., New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge, sitting by designation.

### INTRODUCTION

McDonough Marine Service, as owners of the Barge # 233, and Morton Chemical Company, the bareboat charterer, brought separate actions against the M/V ROYAL STREET and its owner Schieffler Brothers Marine to recover damages which resulted from the sinking of the barge loaded with sodium sulfate while in tow under the custody and control of the defendants. Defendants deny any liability for the aforesaid loss and aver that the loss was caused by or a result of the negligence of Morton and the unseaworthiness of the barge. The actions were consolidated and heard on the _____ day of December 1978, and testimony having been taken before the Court without a jury, and having considered all the pleadings, evidence and demeanor of the witnesses, the Court makes the following:

### FINDINGS OF FACT

1. Morton Chemical Company, a division of Morton-Norwich Products, Inc., was and now is a corporation organized and existing under the laws of a state other than the State of Louisiana. Morton was the bareboat charterer and owner pro hac vice of the McDonough Barge # 233 at all times material herein and the owner of 912 tons of bulk sodium sulfate (salt cake) loaded therein and valued at $61,560.00.

2. McDonough Marine Service, a division of Marmac Corporation was and now is a corporation organized and existing under the laws of a state other than Louisiana. McDonough is the owner of Barge # 233.

3. Schieffler Brothers Marine, Inc., was and now is a corporation organized and existing under the laws of the State of Louisiana. Schieffler Brothers Marine, Inc. is the owner of the M/V ROYAL STREET, a pushboat, which is proceeded against herein, *in rem.*

4. On behalf of Morton and McDonough, an on charter condition survey of Barge # 233 was made by Louisiana Marine Surveying, Inc., prior to said vessel going under charter to Morton from its owner, McDonough. The barge was found to be an all welded steel constructed covered hopper barge designed for the transportation of dry bulk cargoes. The vessel had a raked bow and raked stern with one large hopper type cargo compartment, eight wing compartments, four to port, four to starboard. Each compartment had one steel manhole cover. The vessel was found to be in a generally good and serviceable condition (i. e., able to load a type of cargo for which it was built).

5. The barge was in a seaworthy condition when it was delivered to Morton.

6. The barge was loaded with 912 tons of sodium sulfate with a fair market value of $61,560.00 and towed to the Gulf River Fleet in New Orleans, Louisiana, from where it was to be towed to Port St. Joe, Florida.

7. Morton contacted Spanier Marine to procure a tug to tow the barge to Florida. Spanier Marine acting as an independent boat broker contacted Schieffler Brothers Marine, Inc. to obtain the services of Schieffler's tug, M/V ROYAL STREET, to tow the barge from New Orleans to Port St. Joe.

8. The M/V ROYAL STREET arrival at Gulf River Fleet with two empty Bunge grain barges in tow at approximately 4:00

p. m. on May 9, 1976, and picked up Barge # 233.

9. A visual inspection of the barge was made by the crew of the M/V ROYAL STREET. The barge had about eighteen inches of freeboard and was riding level. All manhole covers appeared to be in place and tight. The crew did not, nor was it necessary to, open the manhole covers and sound the various compartments.

10. Upon leaving the New Orleans area, the barges were arranged in tandem with the load (Barge # 233) made up to the M/V ROYAL STREET and the two empties out ahead one behind the other.

11. The M/V ROYAL STREET was properly manned. The crew included a captain, a relief captain, and one deckhand.

12. While crossing the Mississippi Sound the tow encountered a southerly squal with winds up to 15 knots and 1–3 foot seas. During the squal the steel cables between the M/V ROYAL STREET and Barge # 233 broke. The crew removed the remaining wires connecting the # 233 to the empty barge and placed the # 233 on the leeward (port) side of the two empties.

13. As the tow proceeded across the sound with the # 233 on the north side of the empty barges, heavy weather was again encountered. Because of the heavy ground swells in the unprotected Pascagoula Ship Channel, the Captain sought the sheltered waters off Horn Island. The other available alternatives included backtracking and seeking safety in the protected waters of Gulfport or Biloxi. However, according to the Captain, there was no guarantee that he could find a reasonable place in those harbors to moor the tow until the weather passed. Additionally, venturing into Pascagoula required going through the Pascagoula Ship Channel and encountering the same ground swells they were trying to avoid.

14. The decision to anchor off Horn Island during the storm was not negligence.

15. The tow remained anchored weathering out the storm on Horn Island for ten to twelve hours. The wind had shifted and was now blowing from the north. During this entire period the # 233 had her deck constantly awash.

16. On May 11, 1976, at approximately 6:00 a. m., the weather had cleared and the tow proceeded across the Sound without an inspection of the barge to see if it had taken on any water. No attempt was made to sound the various compartments. A portable pump was available on the M/V ROYAL STREET in the event the barges took on any water.

17. As the tow proceeded toward Mobile it encountered strong head winds and a constant bow wash.

18. At approximately 3:00 p. m., after crossing the channel in Mobile Bay (Mile 148), the crew first noticed that the barge had lost 6 to 8 inches of freeboard and had a forward port list.

19. The captain and the deckhand went aboard the # 233 to inspect the bow. The captain opened the manhole covers and discovered that there was water in the bow rake compartment. All other compartments were dry. An examination of the manhole covers revealed that they were not watertight (i. e. lack of proper gaskets). According to the custom of the shipping trade it is not common practice to require all manhole covers to be watertight on barges used on inland or intracoastal waters.

20. No effort was made to pump the barge at this time. Nor were the tanks sounded to determine the extent of the water.

21. It was the intention of the captain to proceed and pump the barge at the picnic grounds in the Intracoastal Canal.

22. The captain contacted a marine supply store located near Mile 158 in order to determine whether the store had any available pumps, which it did.

23. At approximately 5:00 p. m., in Bon Secour Bay near the entrance to the Intracoastal Canal, the bow of the # 233 was even with the waterline with no freeboard remaining.

24. Barge # 233 could have been beached at this time to prevent further sinking.

25. The captain decided to continue into the canal where he·tied his tow off to the southern bank of the canal at approximately 6:00 p. m. The empty barges were flat against the bank while the # 233 remained tied up on the north side of the empties in the canal.

26. At this time the bow of the barge was under water and resting on the bottom. No effort was made to pump the tanks at this time.

27. The crew of the M/V ROYAL STREET proceeded to the boat store where she was to pick up two pumps. The tug returned to the tow with only one working pump and attempted to pump the bow rake compartment. However, because the bow manhole covers were under water it could not be pumped out.

28. The M/V ROYAL STREET and Schieffler Brothers Marine were negligent in not beaching the barge before allowing it to sink below the waterline.

29. At approximately 8:00 p. m. the captain contacted Dall Thomas of Spanier Marine, the boat broker, and informed him of the situation. Thomas discussed the condition of the barge with Jimmy Schieffler, of Schieffler Marine Bros. and Blaine Broussard, Morton Chemical. Thomas hired Charles Adams, a salvor, to raise the bow of the barge. Adams arrived at the scene around midnight that same evening with minimal equipment for the raising of the barge. When salvage operations began the bow of the barge· was one to three feet under water. However, the cargo at this time was still dry. The initial salvage operation proved ineffective due to Adams' lack of adequate pumps at the site. By the time additional pumps were brought in, the tide had moved in and the water had reached the cargo compartment. When additional efforts by Adams also failed to raise the barge he was relieved as the salvor and the entire barge subsequently sank.

30. Adams was negligent in the handling of the salvage operations and a contributing cause of the sinking of the barge.

31. The lack of water tight integrity of the manhole covers and a lack of water tight integrity between the cargo compartment and the wing tanks (buoyancy compartment) were the causes of the water entering those compartments and ultimately causing the barge to sink. This fact, however, did not render the barge unseaworthy to accomplish its intended purpose. (See Finding of Fact 19).

32. McDonough · Marine obtained the services of a diver S. L. Miller, who raised the barge for $12,318.98, on a time and material basis.

33. The sodium sulfate on the barge which was wetted, solidified. A portion of the cargo, approximately ⅕ to ⅓ had been dissolved and washed out of the barge while it was still submerged. The cargo remaining in the barge had no salvage value.

34. The barge was towed to, and remained at, Southern Marine Shipyard, Mobile, Alabama, from May 20, 1976, until July 8, 1976. From July 8, 1976, to July 13, 1976, the barge was trimmed at Southern Marine for transportation to Port Bienville Terminal, Pearlington, Mississippi. The total expense incurred at Southern Marine was $8,354.55.

35. Morton hired J & F Fabricators to remove the sodium sulfate from the barge by means of jack hammers at an expense of $73,370.00.

36. Morton expended $6,630.00 for fleeting at Port Bienville and paid $972.44 to Spanier Marine for towage of the barge back to New Orleans.

37. Morton paid McDonough $20,275.00 for the charter of the barge from the date of casualty until it was returned to McDonough on February 24, 1977.

38. The fair market value of the McDonough Barge # 233 was $15,000.00. In addition to the $12,324.73 expended to raise the barge, McDonough also spent $2,927.50 for a survey of the damage for a total claim of $15,252.23 against the M/V ROYAL STREET and her owners.

39. The barge could have been declared a constructive loss and deposited on the floor of the Gulf with no risk to the environment. An EPA permit as well as an Alabama State permit could have been obtained without any substantial delay.

40. By June 15, 1976, Richard Yeomans, a marine surveyor hired by Morton, concluded that the cost of removing the cargo far exceeded the value of the cargo.

41. According to the terms of the Charter Party, in the event of a constructive loss, the charter hire ($75.00 per day) shall cease effective the date of the loss. The Barge # 233 was a constructive loss as of June 15, 1976, but nevertheless was repaired and returned to McDonough on February 24, 1977.

The Court draws the following:

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter under 28 U.S.C. § 1333.

2. Venue is properly laid in the Eastern District of Louisiana.

3. The sinking of the Barge, McDonough Marine # 233, was due to the contributing negligence of the crew aboard the M/V ROYAL STREET and Schieffler Brothers Marine and the negligent salvage attempt by Charles Adams.

### THE TOWAGE OF BARGE 233

■ When the M/V ROYAL STREET took Barge # 233 in tow, the barge was sitting level and the manhole covers appeared to be in place pursuant to a visual inspection of the crew of the M/V ROYAL STREET. While it may be prudent seamanship for the crew of a tug to inspect the hatch and manhole covers on a barge to insure they are secure and tight before proceeding into open waters, the tug is nevertheless not an insurer of the tow. *Derby Company v. A. L. Mechling Barge Lines, Inc.,* 258 F.Supp. 206 (E.D.La.1966); *aff'd per curiam,* 399 F.2d 304 (5th Cir. 1968); *Curtis Bay Towing Co. of Va., Inc. v. Southern Lighterage Corp.,* 200 F.2d 33 (4th Cir. 1952).

■ The visual walk-around inspection of the barge by the crew of the M/V ROYAL STREET failed to reveal that the manhole covers aboard Barge # 233 were not water tight. The tug was under no duty to make a detailed examination of the # 233. *Nat G. Harrison Overseas Corporation v. American Tug Titan,* 516 F.2d 89 (5th Cir.), *modified in part,* 520 F.2d 1104 (5th Cir. 1975). The walk-around inspection of the barge made by the crew was adequate and reasonable under the circumstances. *Dow Chemical Co. v. M/V Gulf Seas,* 428 F.Supp. 667 (W.D.La.1977); *New Orleans Coal & Bisso Towboat Co. v. United States,* 86 F.2d 53 (5th Cir. 1936).

■ However, a tug does have a duty to inspect the barges in her tow and keep her under close observation while under tow. *Dwyer Lighterage, Inc. v. Christie Scale Corporation,* 1951 AMC 946 (E.D.N.Y. 1951); *A. G. Staley Manufacturing Co. v. Porto Rico Lighterage,* 323 F.Supp. 27 (E.D. La.1970) *aff'd per curiam,* 438 F.2d 1 (5th Cir. 1971). The degree of care required of the tug is measured with reference to the character of the tow and the condition of the seas and weather. See *Ocean Burning v. Moran Towing and Transportation,* 1974 AMC 2307 (S.D.N.Y.1974).

■ The weather forecast issued by the National Weather Service for this period indicated 1–3 foot seas with winds of 10–15 knots with scattered thunderstorms. These weather conditions were not unusual for the area. The decision of the Captain of the M/V ROYAL STREET to proceed across the Mississippi Sound was not unreasonable. *Valentine Waterways Corp. v. The Tug Choptank,* 260 F.Supp. 210 (E.D. Va.1966). Nor was it unreasonable to wait for the weather to clear at Horn Island rather than to proceed into port at Biloxi, Gulfport or Pascagoula. After the weather had cleared at Horn Island the Barge had eighteen inches of freeboard and was still sitting level. Thus the decision to wait out the storm at Horn Island did not contribute to the sinking of the barge.

■ However, as the tow proceeded into Mobile Bay, the bow of the # 233 was constantly awash, the barge had lost 6 to 8 inches of freeboard, and had a forward port list. The M/V ROYAL STREET was negligent in failing to take reasonable steps to determine the exact condition of the tow and to correct the problem. The tanks were not sounded nor was any effort made to pump the tanks. *American Bridge Division v. Roen Steamship Co.,* 1967 AMC 167 (7th Cir. 1964); *Juno Drill Barge 58,* 1966 AMC 2172 (S.D.Tex.1966). Instead, the tow proceeded on while the bow of the barge continued to lose its remaining freeboard and sink further. While the towing vessel is not liable for a loss occasioned by the unseaworthiness of the tow, if it continues to proceed when the unseaworthiness of the tow is disclosed or apparent it is negligent. *Otto Candies, Inc. v. Great American Ins. Co.,* 221 F.Supp. 1014 (E.D.La.) *aff'd per curiam,* 332 F.2d 372 (5th Cir. 1964).

Allowing the barge to become so full of water that it is down by the bow was also negligence. *Mississippi Valley Barge Line v. T. L. James Co.,* 1956 AMC 2186 (D.C.La. 1956) aff'd 1957 AMC 1647 (5th Cir. 1957). *Henry DuBois Sons Co. v. Tug Mercer,* 1931 AMC 312 (2nd Cir. 1931); *Rice v. Tug Perth Amboy,* 1941 AMC 1508 (S.D.N.Y.1941), aff'd 1943 AMC 679 (2d Cir. 1943); *Louisiana Materials v. Royal Pellegrin,* 211 F.Supp. 4 (E.D.La.1962). This is especially true in light of the available alternatives. The ROYAL STREET could have pumped the # 233 when it first noticed it was listing. Secondly, the ROYAL STREET could have beached the barge in the shallows where it would not sink any further. See *Houma Wells Service v. Tug Captain O'Brien,* 312 F.Supp. 257 (E.D.La.1970). The duty to beach the barge is a duty to beach it on an even bottom so as to prevent it from sliding off. *Throne, Neal and Company v. Reading Co.,* 1939 AMC 334 (2d Cir. 1937); *Curtis Bay Towing Co. v. Southern Lighterage Corp.,* 1952 AMC 2034 (4th Cir. 1952). There were numerous places in the Bay where the # 233 could have been beached.

## SALVAGE OPERATIONS

■ The negligence of the ROYAL STREET was not the sole contributing cause of the sinking of Barge # 233. Upon arrival of the first salvor, Charles Adams, at the Barge # 233, the bow of the barge was completely submerged underwater. However, an examination of the cargo indicated that it was still dry. The salvor had been hired to make an emergency salvage of a loaded barge which was taking on water and in danger of sinking. However, the salvor arrived at the scene with only minimal equipment inadequate to do the job he was hired for. Even when the salvage operations began this Court concludes that the efforts of the salvor were substandard and a contributing cause of the sinking of the barge.

■ Although Barge # 233 sank, it was subsequently raised without much difficulty by another salvor, Buster Miller. During the time the barge was under water the cargo on board, sodium sulfate (salt cake), solidified and was declared a total loss. The amount of money which was spent to have the salt cake removed from the barge (in excess of $80,000) far exceeded the value of the barge ($15,000). The barge should have been declared a constructive total loss. The Charter Party Agreement in effect between Morton and McDonough provided that:

in the event of a total or constructive total loss, charter hire shall cease effective date of such loss or the date the barge was last heard from.

■ Although the course of action taken by Morton and McDonough indicates that they did not treat the barge as a constructive loss their conduct was unreasonable under the existing circumstances. It is generally accepted that alteration, modification or waiver of contract provisions may be implied from the conduct and circumstances surrounding the performance of a contract. *Stauffer Chemical Co. v. Brunson,* 380 F.2d 174 (5th Cir. 1967). However, where the conduct is unreasonable no waiver or modification should be implied.

McDonough and Morton argue that the constructive loss provision refers only to the vessel and not the cargo contained therein. Although their contention is correct, the damaged cargo could not be removed from the barge without expending money that would far exceed the value of the barge. Thus, not only is the cargo damaged, but the barge is also damaged. The cost of repairing the barge includes the cost of removing the cargo from its compartments. In determining whether the barge was a constructive loss, several factors are relevant: (a) the action cost of repairs; (b) the cost of a similar barge on the open market; (c) the cost of constructing a new barge if feasible. The least of these alternatives would furnish the measure of recovery because of the duty of the injured party to mitigate the damages. *Hewlett v. Tug Evelyn (C. G. Willis, Co., et al),* 283 F.Supp. 917 (E.D.Va.1968).

"Generally speaking, in admiralty, the award of damages rests in the sound discretion of the court, and the giving or withholding of damages is predicated upon enlarged principles of equity and justice." (Id.). This Court concludes that the Barge # 233 was a constructive loss and that Morton is only entitled to recover the value of the cargo ($61,560.00) and not the cost of removing the cargo nor the extended cost of the charter hire with one exception. According to the terms of the charter party, since the barge was a constructive loss and since the charter hire was to cease on the effective date of that loss (June 15, 1976), Morton was only liable to McDonough for the extended charter hire from May 12, 1976, to June 15, 1976, in the amount of $2,550.00 (34 days at $75.00 a day). Since Morton has already paid McDonough $20,-275.00 for the extended charter hire from May 12, 1976, to February 24, 1977, they are now entitled to recover from McDonough the value of the charter hire from June 15, 1976, to February 24, 1977, ($17,725.00) even though Morton has no formal claim for damages against McDonough.[1]

McDonough is entitled to recover from the M/V ROYAL STREET and her owners the cost of raising the barge ($12,-324.73) and the subsequent cost of the survey ($2,927.50).

A Judgment will be forthwith entered in accordance with the above Findings of Fact and Conclusions of Law.

---

1. Rule 15(b) Fed.R.Civ.P. provides that "[w]hen issues not raised by the pleadings are tried by the express of implied consent of the parties, they shall be treated in all respects as if they had been raised in all the pleadings." Morton's claim is implicit in the third-party complaint filed by Schieffler Brothers against McDonough.