**ALTER COMPANY, Plaintiff,**

v.

**M/V MISS SUE and the M/V JOHN ROD, their engines, tackle, apparel, and furniture, etc., *in rem*, Alexis Marine Towing, Inc., Kieff Boat Rentals, A & B Insurance Companies, C & D Insurance Companies, Defendants.**

**The DRAKE INSURANCE CO., LTD., Plaintiff,**

v.

**KIEFF BOAT RENTALS, *in personam* M/V JOHN ROD, her engines, tackle, apparel, etc., *in rem*, Defendants.**

**Civ. A. Nos. 80–642, 80–4008.**

United States District Court, E. D. Louisiana.

March 19, 1982.

---

Wilton E. Bland, III, New Orleans, La., for plaintiff Alter Co.

Michael L. McAlpine, New Orleans, La., for plaintiff The Drake Insurance Co., Ltd.

Gayle Reynolds, New Orleans, La., for defendant Alexis Marine Towing, Inc.

Stanhope B. Denegre, New Orleans, La., for defendant Kieff Boat Rentals.

CASSIBRY, District Judge:

This matter was tried to the court on November 16, 1981. After carefully considering the pleadings, the evidence, and the arguments of the parties, I enter the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

At all times pertinent, Alexis Towing, Inc., was a corporation organized and existing under the laws of the state of Louisiana and was the owner and operator of the M/V MISS SUE, an 800 horse power, model-hulled tugboat, 59 feet long and 17 feet wide. On the night of May 3, 1979, her crew consisted of the captain, Raymond Mackey, the mate, Larry Mackey, and a deckhand, Oliver Smith, Jr.

### 2.

At all times pertinent, Kieff Boat Rentals, Inc., and/or 3K Towing Company, Inc., were corporations organized and existing under the laws of the state of Louisiana, and owned and operated the M/V JOHN

ROD, an 800 horse power, twin-screw model hulled tugboat, 59 feet long and 22 feet wide. The JOHN ROD is pilothouse controlled and carries a crew of three men. On the night of May 3, 1979, the crew of the JOHN ROD consisted of the captain, Rickey Barrios, the mate, Peter Plaisance, and a deckhand, Rod Kieff.

3.

At all times pertinent, Alter Company owned and operated Barge AGS–635B, an unmanned, steel covered hopper barge, 220 feet long and 35 feet wide. On the night of the casualty, Barge AGS–635B was fully loaded, giving it a 9′6″ draft (thereby leaving a 2′6″ freeboard) and a loaded displacement of 1,724 tons.

4.

At all times pertinent, the Drake Insurance Company had in full force and effect a hull and machinery policy on the M/V MISS SUE for an agreed value of $200,000.

5.

At all times pertinent, the Mission Insurance Company, Inc., had in full force and effect a policy of insurance on the M/V JOHN ROD.

6.

On May 3, 1979 the river was running very swiftly. The Carrollton gauge registered 16.5 feet.

7.

In the afternoon and evening of May 3, 1979, the M/V MISS SUE and the M/V JOHN ROD were engaged in moving grain barges to and from mid-stream grain elevators attached to ocean-going vessels anchored in the Mississippi River near Ama, Louisiana.

8.

At approximately 7:00 p. m. on the night of May 3, 1979, the MISS SUE was instructed by the fleet dispatcher to move Barge AGS–635B, a fully loaded "box" grain barge, from a fleet on the east bank of the Mississippi River slightly above the anchored vessel DROMON to a grain elevator attached to the port side of the DROMON. The MISS SUE was instructed by the fleet dispatcher to employ the JOHN ROD as a helper tug to move the barge.

9.

The crew of the MISS SUE "faced-up" to Barge AGS–635B using only the two face wires of the tug. There was no bowline between the pointed bow of the MISS SUE and the flat stern of Barge AGS–635.

10.

Before the JOHN ROD joined the flotilla consisting of the MISS SUE and the Barge AGS–635B, the flotilla left the fleet and moved out into the river facing up-river several hundred feet above and parallel to the anchored DROMON.

11.

The MISS SUE intended to drift backwards down the river until it was adjacent to the grain elevator on the port side of the DROMON and then use the aid of the JOHN ROD to push the barge into the grain elevator.

12.

The JOHN ROD joined the flotilla after the flotilla had begun drifting downriver.

13.

The MISS SUE was in sole control of the flotilla.

14.

As the flotilla was drifting backwards, the· captain of the MISS SUE failed to notice that the tow was shifting out of control to the starboard side.

15.

At a point approximately 175 feet above the anchored DROMON, the captain of the MISS SUE noticed that the flotilla was 45 degrees out of alignment with the DROMON.

16.

When the captain of the MISS SUE noticed that the flotilla was out of control, he put the MISS SUE full ahead and told the JOHN ROD to come ahead.

17.

Shortly after the captain of the MISS SUE noted that the flotilla was 45 degrees out of control, the starboard side of Barge

AGS–635B collided with the port anchor chain of the DROMON.

18.

No action or inaction on the part of the crew of the JOHN ROD could have averted the allision.

19.

Shortly after the allision, the MISS SUE began down-flooding through her open engine room doors. Approximately fifteen minutes after the allision, the MISS SUE sank. The open doors hastened the sinking of the MISS SUE.

20.

Shortly after the allision, the current forced Barge AGS–535B nearly perpendicular in the river.

21.

At the time of the allision or shortly thereafter, as a result of the absence of a bowline, the bow of the MISS SUE shifted to starboard on the stern of Barge AGS–635B. The shifting of the bow hastened the sinking of the MISS SUE.

22.

In order to prevent loss of life and a greater catastrophe, the captain of the JOHN ROD used his tug to hold the barge on the anchor chain until assistance arrived.

23.

After assisting tugs arrived, the JOHN ROD evacuated the crew of the MISS SUE.

## CONCLUSIONS OF LAW

1.

The court has jurisdiction over this admiralty matter pursuant to 28 U.S.C. § 1333, and venue is proper pursuant to 28 U.S.C. § 1391(b).

2.

■ The captain of the MISS SUE, Raymond Mackey, was in sole control of and the "dominant mind" of the flotilla consisting of the Barge AGS–635B, the M/V JOHN ROD, and the M/V MISS SUE. The dominant tug is charged with full responsibility for the flotilla's maneuvers. *Naptha Barge Company v. Continental Navigation Company,* 1978 AMC 501, 510 (E.D.La. 1977); *Oil Transfer Company v. Westchester Ferry Company,* 173 F.Supp. 637, 640 (S.D.N.Y.1959).

3.

■ The MISS SUE was negligent in failing to wait for the helper tug, the JOHN ROD, before moving the Barge AGS–635B out into the Mississippi River. *See, e.g., State of Oregon v. The Tug GO-GETTER,* 468 F.2d 1270, 1274 (9th Cir. 1972).

4.

■ In failing to utilize a bowline, the crew of the MISS SUE negligently "made up" the MISS SUE to Barge AGS–635B.

5.

■ The MISS SUE was negligent in failing to establish the proper communication with the JOHN ROD.

6.

■ The MISS SUE was negligent in allowing the flotilla to become 45 degrees out of control approximately 175 feet above the anchored DROMON.

7.

■ Given the flow of the river current on May 3, 1979, the MISS SUE was negligent in failing to begin the descent of the flotilla to the grain elevator further out into the river.

8.

■ The allision between Barge AGS–635B and the port anchor chain of the DROMON and the subsequent sinking of the MISS SUE were brought about solely by the negligence of the MISS SUE.

9.

■ In allowing the flotilla under its control to allide with a stationary object, the MISS SUE is presumptively at fault. *Bunge Corporation v. The M/V FURNESS*

*BRIDGE*, 558 F.2d 790, 794–5 (5th Cir. 1977). The interests of the MISS SUE failed to rebut this presumption.

### 10.

After the MISS SUE lost control of the flotilla, the JOHN ROD was placed in an *in extremis* situation and did all that could have been expected under the circumstances. *Union Oil Company of California v. MARY MALLORY*, 414 F.2d 669, 674 (5th Cir. 1979).

### 11.

The parties have stipulated that the damage to the Barge AGS–635B was $3,500.

The clerk shall prepare judgment accordingly.