**RYAN WALSH STEVEDORING COMPANY, INC.**

v.

**JAMES MARINE SERVICE, INC., et al.**

**In the Matter of the Complaint of JAMES MARINE SERVICE, INC., Owner of the M/V Hiawatha, for Exoneration From or Limitation of Liability.**

**SOUTHERN PACIFIC TRANSPORTATION COMPANY**

v.

**RYAN WALSH STEVEDORING COMPANY, INC., et al.**

Civ. A. Nos. 80–1582, 80–3760 and 81–1313.

United States District Court, E.D. Louisiana.

Feb. 22, 1983.

Francis Emmett, New Orleans, La., for plaintiff.

A. Gordon Grant, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MENTZ, District Judge.

This litigation arises out of an accident that occurred when the D/B FRANK L, while in tow of the M/V HIAWATHA, collided with the Huey P. Long Bridge. As a result of the collision, both the bridge and the barge sustained damage. So, too, did the crane located on the D/B FRANK L. Indeed, as a result of the collision, the crane was lifted from its turntable and fell into the river. The owners and underwriters of the M/V HIAWATHA settled the claims of the bridge owners and filed a cross-claim against the D/B FRANK L, her owner and insurer for those damages. Southern Pacific Transportation Company, the owner and operator of a railroad, claims damages for loss of revenue during the time the bridge

was being repaired because its trains were delayed in crossing the bridge. Jefferson Disposal Company, Inc., claims damages because during that time its garbage trucks could not use the bridge. This opinion addresses questions of liability only. It does not cover the limitation of liability prayed for by James Marine Service in Civil Action No. 80–3760. A non-jury trial was held on September 2 and 3, 1982.

Ryan Walsh Stevedoring Company, Inc. ("Ryan Walsh"), is an Alabama corporation engaged in stevedoring operations in the Port of New Orleans area and, in connection therewith, owned and operated the D/B FRANK L at all times pertinent to this litigation ("the barge"). James Marine Service, Inc. ("James Marine"), is a Louisiana corporation that owned and operated the M/V HIAWATHA (the "tug") at all times pertinent to this litigation.

On April 2, 1980, the boom of D/B FRANK L struck the highest span of the Huey P. Long Bridge. This bridge, which crosses the Mississippi River at Mile 106, just above the Port of New Orleans, is a fixed structure with roadways for automobile traffic on either side and railroad tracks in its mid-section. Maximum vertical clearance of the bridge is 153 feet at the low-water reference plane and 133 feet based upon 1950 high water.

At the time of the collision, the D/B FRANK L was in tow of the M/V HIAWATHA. Captain Burgo and one deckhand manned the tug; the usual navigational equipment[1] was aboard the tug. The barge was approximately 106 feet in length with an American Hoist revolving crane mounted near its stern. The boom of the crane was set in a partially elevated position in line with the center line of the barge. The crown of the boom plumbed even with the bow of the barge. The barge itself was unmanned. This practice was customary for Ryan Walsh in towing barges from one place to another.

At about 1:30 p.m. on April 2, 1980, the Ryan Walsh barge superintendent telephoned Joe Domino, Inc., ("Domino") a tug broker, and requested that Domino assign a tug to move the two derrick barges to the Celeste Street Wharf. Domino's dispatcher agreed to make the necessary arrangements for a tug but subsequently called back and said it would be necessary, owing to high river conditions,[2] to move the two barges individually using two tugs. The barge superintendent agreed. At no time, however, did the dispatcher and the barge superintendent discuss the height of the boom on either barge. There is conflict in the testimony over whether the Ryan Walsh superintendent told Domino's dispatcher that "the barge was ready to go."[3] At trial, the Court asked the dispatcher if that expression had any meaning to him, insofar as navigation was concerned. The dispatcher explained that the expression merely meant "Come get the barge now." On the basis of this testimony the Court finds that the dispatcher did not interpret the expression to mean the crane was in a position to clear the bridge safely.[4]

When the HIAWATHA arrived to pick up the barge, it was unable to make up to the barge because of the placement of various winch wires that helped to secure the barge at its mooring. Captain Burgo communicated this difficulty to the Domino dispatcher, who suggested that Burgo obtain

---

1. This included VHF radios, a radar, and a book of navigational charts of the Mississippi River containing a diagram of the Huey P. Long Bridge and its horizontal and vertical clearances.

2. Marine surveyor, Jules Schubert, stated that the river stage was fourteen feet and if the river had been seven feet lower, the boom would have cleared.

3. James Marine argues that this expression assured the tug of the barge's readiness for its intended voyage, i.e., that it was seaworthy. Ryan Walsh counters that McKee simply asked the Domino dispatcher to get a tug to move two derrick barges from Ama to the Port of New Orleans.

4. It should be noted that Captain Burgo met the tug at the Ama Anchorage and relieved the earlier skipper; there is no suggestion in the testimony that Burgo was told at this time that the tow was "ready to go."

assistance from Ryan Walsh personnel on another crane barge in the area. Captain Burgo then contacted the crew of a nearby Ryan Walsh crane barge. The foreman of that vessel sent over a Ryan Walsh deckhand, who released the winch wires and told Captain Burgo that the FRANK L was "ready to go."

At approximately 7:00 in the evening of April 2, 1980, Captain Burgo turned the FRANK L around in the river and headed south toward the New Orleans harbor. The weather was clear and there was almost no wind. With the barge in front and the boom extending over the wheelhouse, the tug proceeded downriver at approximately 10 knots without a lookout. As he approached the bridge, Captain Burgo failed to shine his spotlight on either the boom or the bridge. Suddenly, Captain Burgo felt a jerk on the vessel. Immediately thereafter, the crane cab and boom slid off the starboard side of the barge into the river.

Experts estimated that the boom of the crane failed to clear the bridge by five to six feet. Burgo admitted he did not know the vertical clearance of the bridge and did not look in his Book of Maps to ascertain it; nor did he know or try to ascertain the river stage to determine clearance. This is especially important since the river was high enough to prompt the tug broker to recommend one tug per barge rather than one tug for both barges, as Ryan Walsh had originally requested.

■ The Court cannot determine whether the D/B FRANK L had a boom angle indicator on it when the M/V HIAWATHA arrived. This being so, the Court finds that James Marine has failed to satisfy its burden of showing that Ryan Walsh was negligent in failing to furnish the indicator and that such a failure contributed to the collision. *See Hart v. Blakemore,* 410 F.2d 218 (5th Cir.1969). The Court does find, however, that the derrick barge had no boom rest (cradle) and therefore did not conform to the Safety Code for Floating Cranes and Floating Derricks, American Society of Mechanical Engineers, 1971 (ANSI) Safety

Code, § 81.3.4. This code requires also that the operator, before leaving the barge, lower the boom to the cradle. ANSI Safety Code, § 83.2.3. James Marine has not shown, however, that Ryan Walsh was any way bound by law to comply with these regulations. Consequently, the Court cannot find that Ryan Walsh's failure to do so constitutes negligence.

■ At issue is whether the tug or the tow was responsible for ascertaining that the boom of the crane on D/B FRANK L could safely pass under the Huey P. Long Bridge. James Marine correctly asserts both that Ryan Walsh, as a party to a contract of towage, warranted that the D/B FRANK L was sufficiently seaworthy "to withstand the ordinary perils to be encountered on the voyage." *South, Inc. v. Moran Towing and Transportation Co., Inc.,* 360 F.2d 1002, 1005 (2d Cir.1966), and that in determining whether the barge was sufficiently seaworthy to withstand the ordinary perils to be encountered on its voyage, the Court must consider whether the barge was "reasonably fit for its intended purpose." *S.C. Loveland v. East West Towing, Inc.,* 415 F.Supp. 596, 605 (S.D.Fla.1976), *aff'd,* 608 F.2d 160 (5th Cir.1979). Additionally, James Marine plausibly argues that, to be reasonably fit for its intended purpose, a floating crane barge must have the ability to function at different sites and the capacity to travel safely from one site to another. Given this, James Marine argues, the FRANK L was not seaworthy and fit for its purpose on April 2, 1980, because its boom height exceeded the vertical clearance of the Huey P. Long Bridge.

■ James Marine also correctly asserts that a tug is not responsible for accidents which occur as a result of the unseaworthiness of its tow. However, even assuming that the barge was unseaworthy because of the positioning of its boom,[5] James Marine's argument fails, for the Court finds that the instant case falls within an exception to that rule, *i.e.,* the tug is responsible if the alleged unseaworthiness is

**5.** The Court is not determining whether or not

this rendered the barge unseaworthy.

so apparent that it would be negligent for the tug to attempt to proceed. *Dameron White Co. v. Angola Transfer Co.,* 19 F.2d 12, 14 (5th Cir.1927); *Otto Candies, Inc. v. Great American Insurance Co.,* 221 F.Supp. 1014, 1018 (E.D.La.1963), aff'd 332 F.2d 372 (5th Cir.1964). Even a casual inspection of the D/B FRANK L with its boom in an upright position should have prompted a reasonably prudent tug captain at least to inquire about the height of the boom relative to the bridge clearance. "The duty of the towing vessel is 'to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.'" *Houma Well Service, Inc. v. Tug CAPT. O'BRIEN,* 312 F.Supp. 257, 260 (E.D.La.1970), quoting *Stevens v. The WHITE CITY,* 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932). Based on his earlier trips under the bridge with this derrick barge, Captain Burgo, as a prudent navigator, should have been aware of the obvious danger of a collision, especially in view of the high water stage of the river on April 2, 1980.

James Marine also argues that it was entitled to rely on the barge superintendent's "assurances" that the D/B FRANK L "was ready" for the contemplated voyage. Again, even assuming that the expression "ready to go" was used, the Court finds that this was not meant to certify that the barge was capable of clearing the bridge; it merely meant that the barge superintendent wanted the tug to move the derrick barge to its next assignment. *City of New York v. McAllister Brothers, Inc.,* 299 F.2d 227 (2d Cir.1962), wherein a navy tug captain told the towing tug captain that a derrick was "ready to tow", supports this interpretation:

> We do not consider that either the initial order from the Navy ensign or the response of the Navy tug captain warranted the fitness of the Y.D. 209 to pass under the bridge; we construe both as saying merely that she had no more work to do at Gravesend Bay. *Id.* at 228.

Ryan Walsh argues that the collision was the result of negligent navigation and that the tug alone was responsible for the safe navigation of her unmanned tow. The barge owners contend that a tug which tows her tow into collision, especially with a stationary object, is presumptively at fault. *See, e.g., Bunge Corp. v. M/V FURNESS BRIDGE,* 558 F.2d 790, 794–95 (5th Cir. 1977); *Alter Co. v. M/V MISS SUE and M/V JOHN ROD,* 536 F.Supp. 313, 316 (E.D.La.1982) ("Dominant Mind" Doctrine)

The master of a tug towing an unmanned barge must know all conditions essential to the safe accomplishment of the undertaking or voyage. This knowledge includes the depth of the water, the ordinary obstructions, the state of the tides and water levels in the channel, and the clearance of bridges to be negotiated. *Linde-Griffith Const. Co. v. Tug Authentic,* 1952 AMC 932, 935 (S.D.N.Y.), *rev'd on other grounds* 1954 AMC 582 (2d Cir.); *see also, Humble Oil & Refining Co. v. Tug CRO-CHET,* 288 F.Supp. 147, 150 (E.D.La.1968), aff'd 422 F.2d 602 (5th Cir.1972). A tug must make a reasonable inspection of her tow before undertaking a voyage. The tug master, moreover, must obtain knowledge from personal cognizance, or avail himself of the means of knowledge, of conditions likely to produce or contribute to a loss, unless appropriate means are adapted to prevent it. *Tebbs v. Baker-Whiteley Towing Co.,* 271 F.Supp. 529, 538 (D.Md.1967); *Avera v. Florida Towing Corporation,* 322 F.2d 155, 166 (5th Cir.1963); *Great Atlantic & Pacific Tea Co. v. Brasileiro,* 159 F.2d 661, 664 (2d Cir.1947). "[C]aptains [are] held to a standard of prudent navigation, including the knowledge they should have had." *Houma Well Service v. Capt. O'Brien,* 312 F.Supp. 257, 262 (E.D.La.1970).

The HIAWATHA has not offered sufficient proof to overcome the presumption that a tug which tows her tow into collision, especially with a stationary object, is presumptively at fault. Captain Burgo did not look at the Corps of Engineers Book of Maps aboard the tug to ascertain the vertical clearance of the Huey P. Long Bridge. Nor did he ascertain the level of the water in the river, although that information was

readily available from the U.S. Corps of Engineers in New Orleans and was essential to determine the vertical clearance of the bridge. Nor did he attempt to ascertain the height of the boom of the D/B FRANK L. Indeed, Captain Burgo undertook the towage of the D/B FRANK L on the voyage in question on the basis of unsubstantial and erroneous assumptions, using only his past experience as a guide. The fact that he had successfully navigated the same barge under the same bridge on at least two earlier occasions did not relieve him of his responsibility to check the bridge clearance and boom height before embarking on this voyage. " 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not.' " *City of New York v. McAllister Brothers, Inc., supra* 7, at 228–29 (quoting Mr. Justice Holmes in *Texas & Pacific Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903)).

Under traditional principles of maritime law, once the master of the M/V HIAWATHA took over the D/B FRANK L without knowing the height of the boom or the vertical clearance of the bridge, all responsibility for the safe conduct of the voyage shifted to him. He could have made the decision either to get the requisite information or, failing that, not to proceed with the tow. *Houma Well Service v. Capt. O'Brien, supra,* at 262; *The City of New York v. McAllister Brothers, Inc., supra; N.Y. Thruway Authority v. Merritt-Chapman,* 1969 AMC 375, 380 (S.D.N.Y.); *Linde-Griffith Const. Co. v. Tug Authentic,* 1952 AMC 932, 934 (S.D.N.Y.).

In light of the foregoing, the Court holds that James Marine, as owner of the tug, is solely liable for damages, including the loss of the crane, resulting from the collision of the boom of D/B FRANK L with the Huey P. Long Bridge on April 2, 1980.