**In the Matter of the Complaint of J.E. BRENNEMAN COMPANY as owner of the crane barge VULCAN/51 for exoneration from or limitation of liability.**

**Civ. A. No. 89–4488.**

United States District Court, E.D. Pennsylvania.

Jan. 8, 1992.

---

Edward V. Cattell, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff.

Eugene J. Maginnis, Jr., Cozen & O'Connor, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This is an admiralty action in which plaintiff J.E. Brenneman Company ("Brenneman") seeks exoneration from or limitation of liability under 46 U.S.C.A.App. § 183 for damages sustained by the Tacony–Palmyra Bridge when it was struck on December 15, 1988, by the crane barge VULCAN/51 as the crane barge was being pushed up the Delaware River by the tug BEVERLY.

The Burlington County Bridge Commission ("the Commission") has filed a claim in connection with this petition. Alleging that the negligence of Brenneman and the unseaworthiness of the VULCAN/51 were contributing causes of the allision, that is, the striking of a moving vessel against a stationary object, the Commission asserts that Brenneman should be found liable for a percentage of the Commission's damages.

Brenneman has filed a cross-claim against the Commission, alleging that the negligence of the Commission in its operation of the Tacony–Palmyra Bridge was a contributing factor in the allision and as a result, the Commission should be found liable for a percentage of the damages to the bridge.

Because the BEVERLY interests have settled with the Commission and Brenneman, this Court has been requested to determine the respective liabilities and proportionate faults of the Commission and Brenneman only. After a three-day bench trial, this Court holds that no liability may attach to either Brenneman or the Commission. For the reasons set out below, therefore, this Court will grant Brenneman as owner of the crane barge VULCAN/51 exoneration from liability, and will further find no liability on the part of the Commission in connection with the allision.

## I. FINDINGS OF FACT

Barney Carlsen, Sr. and River Enterprises, Inc. ("River Enterprises"), the owner and charterer respectively of the tug BEVERLY, entered into a verbal contract to provide towing services on December 15, 1988, for the VULCAN/51, the crane barge owned by Brenneman. Under that contract, the tug BEVERLY met the unmanned VULCAN/51 as it was being towed by Brenneman's work boat COOPER'S POINT, at the mouth of the Schuylkill River. The BEVERLY "made up" to and towed the VULCAN/51 up the Delaware River toward its destination of Bristol, Pennsylvania.

The BEVERLY's voyage up the Delaware River required it to pass under three fixed span bridges, which were the Walt Whitman, the Ben Franklin and the Betsy Ross. These bridges presented no navigation clearance problems, the lowest of the bridges being the Ben Franklin at about 135 feet above mean high water. The BEVERLY was also required to pass under two drawbridges. The first drawbridge, the Delair Bridge, is a low-clearance railroad "lift" bridge. The second, and the subject of this litigation, is the Tacony–Palmyra Bridge, a low-clearance "bascule" bridge, of which the main arch span is fixed while another span opens by the raising of two hinged "leaves."

At the time the tug BEVERLY picked up the VULCAN/51 at the mouth of the Schuylkill River, the BEVERLY's captain, David Carlsen, knew the height of the fixed arch span of the Tacony–Palmyra was 64 feet at mean high water. Captain Carlsen did not know the height of the VULCAN/51 as it had been "dogged down" by the Brenneman crew. He was not given this height by Brenneman. Brenneman, further, had no procedure requiring its people to ascertain the height at which a crane had been set, nor of communicating the height to a tug captain.

Captain Carlsen made a visual estimate of the height of the VULCAN/51, which turned out to be grossly in error. Captain Carlsen had not been on deck when the tug "made up" to the VULCAN/51 and thus, he did not see the crane barge until the tug and tow were already underway, when his only perspective was that of looking up the crane from behind. He estimated the total height of the VULCAN/51 to be about 55 feet. Further, he assumed that Brenneman had set the crane of the VULCAN/51 low enough to safely pass under the fixed arch span of the Tacony–Palmyra Bridge, based on his experience of previous tows of the VULCAN/51, for which an opening had never been needed. As determined after the allision with the Tacony–Palmyra Bridge, the height of the VULCAN/51 was nearer 88 feet.

With the captain having made the erroneous assumption on the height of the VULCAN/51, the tug and tow proceeded up the Delaware River. Although a deckhand moved between the deck and the wheelhouse, and was basically keeping an eye on the crane, he was not posted as a look-out in a position that would enable him to ascertain the clearance of the crane in time to enable the tug to avoid allision with a bridge. On the basis of past personal experience, the deckhand, too, assumed the tow would fit under the fixed arch span of the Tacony–Palmyra.

As the BEVERLY approached the Delair Bridge, Captain Carlsen requested a "half-a-lift" opening, which he assumed to be about 75 feet. The operator of the lift, the "tender," determined visually, however, that the tow would not clear this height, and raised the lift higher. The bridge tender did not so inform Captain Carlsen. This communication, and another asking for a lift of 60 feet, were heard by the bascule tender of the Tacony–Palmyra Bridge, Maryanne Brewer, who was monitoring the Tacony–Palmyra's marine radio.

On the day of the accident, Brewer had come on duty at about 7:00 a.m. At 11:15 a.m., she left the tower to perform a routine inspection of the bridge and bascule raising equipment, taking with her a hand-held radio. At some point, she heard a tug request a height of 60 feet from the Delair Bridge. Brewer thought this had been the BEVERLY; however, according to the bridge tender of the Delair, this had been another tug, the DELAWARE. At 11:45 a.m., she returned to the bascule tower, and saw the BEVERLY and tow about three-quarters of a mile downriver, between the Tacony–Palmyra and the Betsy Ross bridges. They appeared to her to be "parked." Brewer did not contact the BEVERLY, because it was not the bridge's practice to call to vessels to ask their intentions, and because vessels often pass under the fixed span of the bridge without contacting the bascule tender. Brewer, further, had never had a captain contact her to determine if a tow would clear the fixed span.

After a cursory view of the river, Brewer again left the tower, taking with her the hand-held radio and descending to a room without windows on the first floor of the bascule tower, where she changed out of the coveralls she wore for the bridge inspection, and made a cup of tea for her lunch.

Upon returning to the bascule tower at approximately 12:00 noon, Brewer saw the BEVERLY and the VULCAN/51, but she was not certain that the boom of the VULCAN/51 would not clear the bridge. When she at last determined that it would not

clear, Brewer immediately tried to radio the BEVERLY. The captain and deckhand of the BEVERLY had, at about the same time, realized that the crane would not pass safely under the arch span, and the captain had put the engines in full reverse.

Within seconds, the jib boom of the crane struck the sidewalk railing and sidewalk of the bridge, after which the jib boom bent back and the main boom hit a tie member of the arch of the bridge, fracturing the inside steel angle and bending the main tie member steel plates.

At no time did the BEVERLY contact the Tacony–Palmyra for an opening. It did not do so because it had not intended to go under the draw span, but had assumed that it would safely pass under the arch span.

## II. DISCUSSION

The admiralty and maritime jurisdiction of the United States extends to cases of damage to property on land caused by a vessel in navigable waters. 46 U.S.C.A.App. § 740. Under the rule adopted in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975), a court must allocate damages among the parties "proportionately to the comparative degree of their fault." Admiralty law supplies the standard of conduct to be applied in a maritime case through statutes, rules made under the authority of a statute, case law, or maritime custom. If, however, admiralty law itself does not supply the standard of conduct to be applied, then the conduct is judged according to principles of tort law, especially the principles of negligence. *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 165 (5th Cir.1979); *Pennsylvania Railroad Company v. S.S. Marie Leonhardt*, 202 F.Supp. 368, 375 (E.D.Pa.1962), *aff'd* 320 F.2d 262 (3d Cir. 1963). Contributory negligence does not involve breach of any duty owed to others but, rather, is a failure to reasonably safeguard one's own person or property; that is, a failure to act as one should may constitute contributory negligence. *S.C. Loveland*, 608 F.2d at 166. However, it is elementary that any negligence, to be action-

able in a claim by another, must be a proximate cause of the damages. Put another way, "fault which produces liability must be contributory and proximate cause of the collision, and not merely fault in the abstract." *Board of Commissioners of the Port of New Orleans v. M/V Farmsum*, 574 F.2d 289, 297 (5th Cir.1978).

The interests of the tug BEVERLY have settled with the Commission and Brenneman. This Court was requested, however, to determine the respective liabilities and proportionate faults of the Commission and Brenneman in relation to the BEVERLY. The Commission requested this Court to find the BEVERLY liable for 70 percent, Brenneman liable for 30 percent, and the Commission liable for none of the damage. Brenneman requested this Court to find the BEVERLY liable for 90 percent, the Commission liable for 10 percent, and Brenneman liable for none of the damage.

Brenneman asserts that the Commission must be found to have a percentage of liability for the allision because the Commission was negligent for failure to have a bridge tender in the operator's station to keep proper lookout for approaching vessel traffic and to provide warning, as necessary, to avoid allisions between vessels and the bridge. Brenneman further claims that the absence of the bridge tender from her station after having seen a vessel approaching the bridge was unreasonable under the circumstances, and was therefore negligent.

The Commission, on the other hand, asserts that Brenneman must be found to have a percentage of liability for the allision and is not entitled to exoneration from or limitation of liability because the VULCAN/51 was unseaworthy for its intended voyage and because Brenneman was negligent. The Commission asserts that the VULCAN/51 was unseaworthy for its intended voyage because it should have been prepared for the voyage in such a way that it could safely pass under all the bridges on the Delaware including the Tacony–Palmyra without the necessity of requesting an opening. The Commission asserts that Brenneman was negligent because it did

not ascertain the height of the crane, and because it had no internal company procedures for ascertaining the height of its cranes and giving this information to the tug captains.

Under traditional principles of admiralty and maritime law, this Court has looked to statutes, rules made under the authority of a statute, case law, and maritime custom, and has determined that the tug BEVERLY must assume total responsibility. Further, this Court has determined that any alleged negligence of either the Commission or Brenneman was not a contributory or proximate cause of the allision. This Court therefore finds that even under principles of tort law, especially the principles of negligence, the tug BEVERLY must remain totally liable. As between the Commission, Brenneman, and the BEVERLY, therefore, this Court finds that the BEVERLY must assume liability of 100 percent, and that a percentage of liability may in no way attach to either the Commission or to Brenneman.

### A. The Negligence of the Tug BEVERLY

Under traditional principles of maritime law, a tug master must know all conditions essential to the safe accomplishment of the voyage and must make a reasonable inspection of the tow before undertaking the voyage. The tug master, moreover, "must obtain knowledge from personal cognizance, or avail himself of the means of knowledge, of conditions likely to produce or contribute to a loss, unless appropriate means are adapted to prevent it." *Ryan Walsh Stevedoring Co. v. James Marine Service*, 557 F.Supp. 457, 461 (E.D.La. 1983), *aff'd*, 729 F.2d 1457 (5th Cir.1984), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984), citing *Avera v. Florida Towing Corp.*, 322 F.2d 155, 166 (5th Cir. 1963); *Great Atlantic & Pacific Tea Co. v. Brasileiro*, 159 F.2d 661, 664 (2d Cir.1947); *Tebbs v. Baker–Whiteley Towing Co.*, 271 F.Supp. 529, 538 (D.Md.1967).

As heretofore pointed out, Captain Carlsen grossly underestimated the height of the crane boom, on the basis of a visual estimate made after the BEVERLY

had made up to the VULCAN/51, when the tug and tow were already underway. Further, he assumed that the crane barge had been prepared as it had in the past, so that it would pass under the fixed arch span of the Tacony–Palmyra. The fact that he had successfully navigated the VULCAN/51 under the Tacony–Palmyra in the past, however, did not relieve him of the responsibility of making a reasonable inspection of his tow, that is, of checking his clearance on this particular voyage. Under traditional principles of maritime law, once the master of the tug BEVERLY took over the VULCAN/51 without knowing the height of the crane boom, all responsibility for the safe conduct of the voyage shifted to him. *Ryan Walsh*, 557 F.Supp. at 462.

Captain Carlsen, thus, had the ultimate responsibility for making a reasonable inspection of his tow. Had Captain Carlsen made a reasonable inspection of his tow, he would have determined that, as configured on December 15, 1988, the VULCAN/51 would not pass safely under the fixed arch span of the Tacony–Palmyra, and there would have been no allision.

This Court finds that, under traditional principles of maritime law, the failure of Captain Carlsen to make a reasonable inspection of his tow was the supervening cause of the allision, supplanting all defenses attributable to any alleged negligence of other parties. This Court finds, therefore, the BEVERLY must assume 100 percent liability for the allision.

### B. The Liability of the Commission

 Brenneman asserts that the BEVERLY should be liable only to the extent of 90 percent. The remaining 10 percent, Brenneman asserts, should be attributed to the negligence of the Commission for failure to have a tender continuously in the operator's station to keep proper lookout for approaching vessel traffic and to provide warnings to vessels, as necessary, to avoid allisions between vessels and the bridge. Brenneman further asserts that, under the circumstances of this allision, the absence of the tender from her station after having seen a vessel approaching the bridge was unreasonable and therefore negligent. This Court finds, however, that under traditional principles of maritime law, there is no basis for holding the Commission to any liability. This Court further finds that, under principles of tort law, especially those of negligence, neither the Commission's failure to have a bridge tender in continuous visual contact with the river nor, under the circumstances of this particular allision, the failure of its bridge tender to remain in the operator's station after seeing the BEVERLY at a distance of three-quarters of a mile, in any way relieves the tug BEVERLY of total liability for this allision.

 When a moving vessel collides with a fixed object, there is a presumption that the moving vessel is at fault, and this presumption suffices to make out a prima facie case of negligence against the vessel. *Woods v. United States, Department of Transportation*, 681 F.2d 988, 990 (5th Cir. 1982); *Patterson Oil Terminals, Inc. v. Port Covington*, 109 F.Supp. 953 (E.D.Pa. 1952), *aff'd*, 205 F.2d 694 (3rd Cir.1953). Bridges, however, are obstructions to navigation, and therefore, any presumption of negligence of the vessel disappears when evidence of negligence of the bridge is presented. *Pennsylvania Railroad Company v. S.S. Marie Leonhardt*, 320 F.2d 262, 264 (3d Cir.1963).

 In admiralty actions, the duty of a drawbridge owner is derived from four sources: laws enacted by Congress, regulations issued by an authorized federal agency, dictates of custom, and reasonableness and prudence. *Pennsylvania Railroad v. S.S. Marie Leonhardt*, 202 F.Supp. 368, 375 (E.D.Pa.1962), *aff'd*, 320 F.2d 262 (3d Cir.1963). If admiralty law does not supply the standard, that is, if the situation is not governed by statute, rules made under the authority of a statute, or maritime custom, then this Court must judge the conduct of the Commission according to the principles of tort law, especially the principles of negligence. *S.C. Loveland*, 608 F.2d at 165; *Pennsylvania Railroad*, 202 F.Supp. at 375.

**1028**

Although Brenneman asserts that the Commission was negligent for failure to have a tender in continuous visual contact with the river to keep a proper lookout for approaching vessel traffic and to provide warnings, as necessary, to avoid allisions between vessels and the bridge, still, Brenneman can point to no law enacted by Congress, no regulation authorized by a federal agency, nor any maritime custom which would require a bridge tender to be in visual contact with a river at all times. Federal statutes and regulations require only that a drawbridge owner ensure that its drawbridge "be opened ... upon reasonable signal for the passage of boats and other water craft." 33 U.S.C.A. § 494. *See also,* 33 C.F.R. §§ 117.1–117.49 (regulations for drawbridge operations).

Brenneman counters that failure of the Commission's bridge tender to maintain a continuous look-out is a violation of the intent if not the letter of the regulations. According the 33 C.F.R. § 117.904(b), the Tacony–Palmyra is required to be opened on demand, 24 hours per day, 365 days per year, within 5 minutes of the request. This regulation, Brenneman states, requires that the bridge tender be in the operator's station at all times during the approach of a vessel to the bridge.

This Court is unpersuaded that federal regulations mandating the Tacony–Palmyra be opened on demand demonstrate an intent that a bridge tender be in continuous visual contact with the river. Brenneman has produced no evidence that such an intent is manifested in any order, regulation, directive or commentary of any authority. Nor has Brenneman produced evidence of maritime custom that would mandate the Commission's bridge tender remain in visual contact with the river, nor of a maritime custom that the bridge tender coordinate vessel traffic other than that traffic that is passing through the bascule span of the Tacony–Palmyra. The bridge tender has no control over, nor duty to contact, a vessel that chooses to abide by the maritime "rules of the road" and pass unassisted under the fixed arch span of the Tacony–Palmyra. Further, the Commission is under no regulatory burden, nor a burden imposed by maritime custom, of posting a look-out to police the river in anticipation of vessels operating in a potentially negligent manner. This Court finds, therefore, that the Commission satisfies its regulatory burden by having its bridge tender in radio contact.

As to Brenneman's assertion that, under the tort principles of negligence, the Commission should be held liable for a percentage of the damages to the Tacony–Palmyra because of its failure to have a look-out in continuous visual contact with the river or because the absence of the bridge tender from her station in this particular circumstance was unreasonable and therefore negligent, this Court finds that here, too, Brenneman has failed to carry its burden of proving that any alleged negligence of the Commission was a contributory or proximate cause of this allision.

The bridge tender, Maryanne Brewer, on returning to the bascule operator's station at 12:00 noon, saw the BEVERLY but was not certain that the crane boom would not clear the fixed arch span. By the time she had concluded that the boom would not clear, it was too late to prevent allision. Brenneman asserts that had Brewer been in the bascule operator's station from the time she first spotted the BEVERLY when it was about three-quarters of a mile downstream, and had she maintained visual contact as it approached, she would have been able to conclude in sufficient time to warn the tug that the crane boom would not clear. That is, once a bridge tender sees vessel traffic in proximity to a bridge, Brenneman asserts that it is negligent for the bridge tender to fail to monitor and direct that vessel regardless of whether the vessel is intending to contact the bridge tender for passage through the bascule span, or intending to utilize the maritime "rules of the road" and pass unassisted under the fixed arch span. Brenneman further asserts that it is negligent for the bridge tender to fail to independently determine that a vessel can safely pass under the fixed arch span.

As pointed out above, Brenneman can cite no statute, regulation, or maritime custom requiring a bridge tender to keep continuous visual contact, to monitor and direct vessel traffic except as that traffic is passing through the bascule span of the bridge, or to independently determine whether a vessel will safely pass under a fixed arch span. Brenneman, through the testimony of a naval architect, attempted to persuade this Court that had Brewer been in the bascule operator's station at a height of approximately 90 feet during the approach of the BEVERLY, and had she been looking out across the river and watching the BEVERLY as it approached, she would have been able to conclude in sufficient time to warn the tug that the boom would not clear. On the basis of the evidence presented by Brenneman, this Court finds this contention, frankly, incredible.

First, it must be remembered that tugs with tows commonly pass without incident and without any communication with the bascule operator under the fixed arch span, utilizing the maritime "rules of the road." The approach of this particular tug and tow was apparently normal and nonnegligent, and by its course through the water, the tug and tow were moving with the intention of passing under the fixed span of the Tacony–Palmyra. It did not contact the Tacony–Palmyra that it wanted a bascule opening, or that it needed assistance in determining its clearance. Brewer had heard a radio communication of a tug that she assumed had been the BEVERLY with the Delair Bridge that had asked for an opening of 60 feet. The clearance of the fixed arch span of the Tacony–Palmyra is 64 feet at mean high water. Based on what she had interpreted as this vessel's communication with another bridge, she was not, therefore, anticipating a vessel that was doubtful of its clearance, or that needed her assistance in any way. There was, in short, nothing that would have drawn her suspicions, even had she been in continuous visual contact with the vessel traffic on the river, to this particular tug and tow.

Second, this Court was told by Brenneman's own employees that, although they had worked with this particular crane at many different times, in many different configurations, and in may different locations during which they had reference points against which to judge the height of the boom, still, they had not known the height of the VULCAN/51 on this voyage, that in fact, they were unable to visually estimate the height of their own boom, and that they needed a computer to determine its height. This Court finds it inconsistent, to say the least, for Brenneman to also contend that a bridge tender should be able to determine the height of a boom early enough to avoid an allision when the tender is looking out across the river and toward the middle of the river at a boom which she is not accustomed to seeing—much less physically working with—and that is standing against nothing that would give her perspective as to its height.

Third, the expert opinion of a naval architect is not conclusive as to what another person might be able to see and determine. Brewer testified that, on returning to the operator's station and seeing the BEVERLY, she was not certain that it would not clear the fixed arch span of the bridge. Within seconds, the jib boom struck the sidewalk railing of the bridge. Assuming, *arguendo*, as Brenneman's experts testified, that the BEVERLY could have avoided allision had Brewer notified it before it was within 300 feet of the bridge, this Court finds it unlikely that Brewer's uncertainty about whether the boom would clear would have been any less at 300 feet than it was within seconds of the allision. Although the length of time one has to observe may improve one's perspective, this form of "Monday morning quarterbacking" is hardly sufficient basis for determining what another person may be able to determine when looking out at a moving, unfamiliar object that is isolated in the middle of a river. It is certainly insufficient basis for a finding of negligence when Brenneman's own employees were unable to visually estimate the height of that very same object even after years of physically working with it.

Even had the bridge tender maintained visual contact with the BEVERLY, therefore, this Court finds that there is no basis on which to find that the tender could have ascertained in sufficient time to avoid the allision that the boom would not pass safely under the bridge.

This Court finds, therefore, that under principles of tort law, especially the principles of negligence, Brenneman has failed to carry its burden of establishing that the allision would have been avoided if the bridge tender had maintained continuous visual contact with the river, or if Brewer had remained in the operator's station after seeing the BEVERLY at a distance of three-quarters of a mile. This Court further finds that Brenneman has failed to establish that any alleged negligence of the Commission in any way relieves the tug BEVERLY of total liability for this allision. This Court finds, therefore, that any alleged negligence of the Commission was not a contributing or proximate cause of the allision.

### C. The Liability of Brenneman

The Commission asserts that the tug BEVERLY should be found only 70 percent liable for the allision, and that Brenneman should be found liable for the remaining 30 percent. The Commission asserts that the VULCAN/51 was unseaworthy for its intended voyage because it was not prepared in such a way that it could safely pass under the Tacony–Palmyra without the necessity of a bascule opening. The Commission further asserts that Brenneman was negligent in not ascertaining the height of this crane and in not having general internal company procedures for ascertaining the heights of its cranes and giving this information to tug captains. This Court finds, however, that under traditional principles of maritime law, there is no basis for holding Brenneman liable for any alleged unseaworthiness of the VULCAN/51 as it was configured on December 15, 1988. This Court further finds that, under principles of tort law, especially of negligence, neither Brenneman's failure to ascertain the height of the VULCAN/51 nor its lack of any general internal procedure for ascer-

taining the height and giving it to tug captains, under the circumstances of this particular allision, in any way relieves the tug BEVERLY of total liability for this allision.

As to the Commission's assertion that the VULCAN/51 was unseaworthy for its intended voyage, this Court must determine whether it was "reasonably fit for its intended purpose." *S.C. Loveland, Inc. v. East West Towing, Inc.*, 415 F.Supp. 596, 605 (S.D.Fla.1976), *aff'd*, 608 F.2d 160 (5th Cir.1979). That is, the Court must determine whether the VULCAN/51 was unseaworthy because its boom height exceeded the vertical clearance of, specifically, the Tacony–Palmyra.

The Commission asserts that, under 33 C.F.R. § 117.11, the VULCAN/51 was unseaworthy. 33 C.F.R. § 117.11 states:

> Appurtenances unessential to navigation: No vessel owner or operator shall signal a drawbridge to open for any nonstructural vessel appurtenance which is not essential to navigation or which is easily lowered.

The Commission has not shown, however, that Brenneman was in any way bound by law to comply with this regulation. No evidence was presented of any rules made under the authority of a statute that has been issued by any admiralty or maritime agency implementing § 117.11 in relation to crane barges. No evidence was presented that Brenneman had been reprimanded by any admiralty or marine agency for failure to set its cranes to pass under the fixed arch span of the Tacony–Palmyra. No evidence was presented that the Commission had ever reported Brenneman, or any other crane barge company, to any admiralty or maritime agency for not so setting its cranes. It is the finding of this Court, further, that as of the time of allision, it was acceptable for tugs to ask for an opening of Tacony–Palmyra when towing Brenneman crane barges. It is the finding of the Court, moreover, that prudence was more frequently followed, in that under maritime custom, tugs were encouraged to use the bascule span if in doubt of their clearances.

This Court further finds that any alleged unseaworthiness of the VULCAN/51 as it was configured on December 15, 1988, in no way relieves the tug BEVERLY of total liability for this allision. A tug is not responsible for accidents which occur as a result of the unseaworthiness of its tow. There is, however, an exception to this rule, which is that the tug is responsible if the alleged unseaworthiness is so apparent that it would be negligent for the tug to attempt to proceed. *Ryan Walsh*, 557 F.Supp. 457 at 461. As discussed in Section II(A), *supra*, Captain Carlsen made his estimate of the height of the crane boom only after the BEVERLY had made up to the VULCAN/51, when the tug and tow were already underway, and when his only perspective was that of looking up the crane from behind. In so limiting his inspection, Captain Carlsen failed to obtain knowledge of a condition essential to the safe accomplishment of the voyage. Assuming *arguendo* that any unseaworthiness of the VULCAN/51 due to its configuration was apparent, then it was negligent for the tug BEVERLY to proceed. Assuming *arguendo* that any unseaworthiness due to its configuration was not apparent, still, the tug BEVERLY did not make a reasonable inspection of its tow. Once the master of a tug takes over a tow without knowing the height of the boom, all responsibility for the safe conduct of the voyage shifts to him. *Ryan Walsh*, 557 F.Supp. at 462. Under these facts, therefore, Captain Carlsen assumed total responsibility for the safety of the voyage. Thus, under traditional principles of maritime law, it must be the finding of this Court that any alleged negligence of Brenneman does not relieve the tug BEVERLY of total liability.

The Commission further asserts that Brenneman was negligent because it did not ascertain the height of the crane, and because it had no internal company procedures for ascertaining the heights of its cranes and of giving this information to tug captains with whom it contracted. Although Brenneman's practices may have involved a failure reasonably to safeguard its own property, still, Brenneman can be held to a percentage of liability for this allision only if its alleged negligence was contributory and proximate cause of the allision, and not merely fault in the abstract. *Board of Commissioners of the Port of New Orleans*, 574 F.2d at 297.

In an admiralty action, further, this Court may apply principles of tort law only after determining that admiralty law does not supply the standard of conduct to be applied. *S.C. Loveland*, 608 F.2d at 165.

This Court finds that admiralty law does supply the standard of conduct. As discussed *supra*, Captain Carlsen took over the VULCAN/51 without making a reasonable inspection of his tow. Further, he made no attempt to contact the Brenneman office on his cellular telephone to see if the crane had been set in the same manner as on previous tows, or if they knew the height of the crane as it had been set on this tow. Because he failed to make a reasonable inspection or to obtain knowledge of a condition essential to the safe accomplishment of the voyage, all responsibility for the safe conduct of the voyage shifted to him. *Ryan Walsh*, 557 F.Supp. at 462.

Further, Brenneman's lack of any company procedures for ascertaining the heights of its cranes and of giving this information to tug captains with whom it contracted for tows, when added with the admission of Barney Carlsen, the owner of River Enterprises, that he and Brenneman's dispatcher never discussed the heights at which cranes would be set, indicate that there was no maritime custom to which Brenneman must be held accountable. Under traditional principles of maritime law, therefore, this Court finds that any alleged negligence of Brenneman does not relieve the tug BEVERLY of total liability for the allision. Thus, no liability for any alleged negligence may attach to Brenneman.

### III. Conclusion

In light of the foregoing, the Court finds that no liability may attach either to Brenneman or to the Commission. Therefore, as to the allision of December 15, 1988, between the crane barge VULCAN/51 and

the Tacony–Palmyra Bridge, this Court will grant exoneration from liability to Brenneman as owner of the crane barge VUL-CAN/51, and will further find no liability on the part of the Commission as owner and operator of the Tacony–Palmyra Bridge.